[No. 48036–2.   En Banc.   December 15, 1983.]

JACK L. BOWERS, ET AL, *Respondents,* v. TRANSAMERICA
TITLE INSURANCE COMPANY, *Appellant.*

*Richard M. Thatcher* (of *Torbenson & Thatcher*) and *Orly J. Sorrel* (of *Sorrel & Palken*), for appellant.

*Delay, Curran, Thompson & Pontarolo, P.S.,* by *Joseph P. Delay* and *Henault & Hancock,* by *John B. Hancock,* for respondents.

PEARSON, J.—Defendant Transamerica Title Insurance Company (Transamerica) appeals a summary judgment holding it liable to a vendor of real estate for failing to meet the standard of care required of an attorney, and an award of $42,805 in attorney fees.

Four issues are presented in this appeal:

1. Whether an escrow agent who is not authorized to practice law is liable in damages for failing to advise a vendor to obtain independent legal counsel as to the risks of an unsecured sale of real estate.

2. Whether the unauthorized practice of law by an escrow agent is an unfair or deceptive trade practice prohibited by the Consumer Protection Act, RCW 19.86.

3. Whether the measure of damages for the loss of a security interest in property is the reasonable value of the property on the date the security interest was lost.

4. Whether the trial court abused its discretion in awarding attorney fees of $42,805 under RCW 19.86.090.

We hold that:

1. An escrow agent is liable for damages resulting from the agent's failure to advise a party to a real estate closing to obtain independent legal advice.

2. The unauthorized practice of law by defendant constituted a violation of the Consumer Protection Act.

3. The reasonable value of the property is an appropriate measure of damages for the loss of a security interest in this case.

4. The trial court improperly calculated the "lodestar" figure and applied multipliers in determining reasonable attorney fees under the formula approved in *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973). We remand for computation of reasonable fees under principles outlined below.

Plaintiffs Mr. and Mrs. Bowers, and Mr. Bowers' brother Robert, purchased a parcel of real estate in 1971 as an investment. In 1978, plaintiffs advertised the property for sale at a price of $45,000. They received a response to the advertisement from one Dan Brown, president of Quantum Construction, Inc. (Quantum). Brown expressed interest in buying the property, and after some discussion presented Mr. and Mrs. Bowers with an earnest money agreement, in which Quantum agreed to buy the property for $45,000, payable $10,000 at closing, with the balance to be paid "by

purchaser executing a note in favor of the seller". The earnest money agreement designated Transamerica the closing agent for the transaction. Mr. and Mrs. Bowers signed the earnest money agreement.

Mrs. Bowers held Mr. Bowers' power of attorney and signed most of the closing documents on his behalf. (Robert Bowers had contributed to the purchase price of the property, but was not a record owner; Mr. and Mrs. Bowers considered him a silent partner pursuant to an oral agreement.) Mrs. Bowers had been involved in one real estate transaction prior to the present one: the cash sale of another piece of property earlier in 1978.

The sale from the Bowerses to Quantum was closed by Bonniejean Evans, an escrow closer employed by Transamerica. Mrs. Evans is not an attorney. She prepared the closing documents from the earnest money agreement drawn up by Quantum and signed by Mr. and Mrs. Bowers. Mrs. Evans prepared the seller's escrow instructions and the buyer's escrow instructions, both of which specified that the note representing the unpaid portion of the purchase price was to be unsecured. In the course of preparing the papers, Mrs. Evans asked Dan Brown of Quantum whether the note was to be unsecured. Brown replied "The earnest money does not say secured by a deed of trust. It says a note." Mrs. Evans accordingly prepared an unsecured promissory note. Mrs. Bowers signed these and the other closing documents.

After closing, the deed to the property was delivered to Quantum. Quantum borrowed in excess of $30,000, using the property as security. In May 1979 a petition in bankruptcy was filed against Quantum. It was subsequently discovered that the shareholders of Quantum had departed the jurisdiction for places unknown. Plaintiffs consulted an attorney upon learning of the bankruptcy petition and the present litigation was commenced in May 1979.

Plaintiffs alleged that Transamerica had engaged in the unauthorized practice of law and in so doing had caused the plaintiffs to lose $35,000. Plaintiffs sought damages, attor-

ney fees, and costs pursuant to RCW 19.86 (Consumer Protection Act). Transamerica denied it was practicing law, and claimed that plaintiffs were negligent in not seeking legal advice and that any loss suffered by plaintiffs was the result of fraud perpetrated by Quantum. Cross motions for summary judgment came before the Spokane County Superior Court in March 1981. The court decided that Transamerica had engaged in the unauthorized practice of law and was therefore held to the standard of an attorney. Transamerica fell below this standard by failing either to advise plaintiffs to seek independent counsel if they did not understand the transaction, or to explain to plaintiffs the hazards of an unsecured sale of real property. Transamerica was, therefore, liable to plaintiffs for the loss caused by this breach of duty. Moreover, the court held the unauthorized practice of law constituted a violation of the Consumer Protection Act. The court accordingly granted plaintiffs' motion for summary judgment as to proximate cause and liability, and left open the issue of damages to be determined at trial.

The trial on the issue of damages took place over 2½ days in late April and early May 1981. The court concluded that the extent of plaintiffs' damages was the value of the hypothetical security interest they would have received had they sold the property subject to a deed of trust. After hearing considerable evidence as to the value of the property, with valuations ranging from $19,500 to $43,000, the court determined that the reasonable value of the lost security interest was $33,000.

The final stage of the proceedings was a hearing on July 8 and 9, 1981, to determine an award of reasonable attorney fees as provided by RCW 19.86.090. The court awarded attorney fees of $42,805, costs of $3,673, and additional damages under the Consumer Protection Act of $1,000. Transamerica appealed directly to this court.

It is not disputed that defendant's escrow closer, Mrs. Evans, engaged in the unauthorized practice of law. Mrs. Evans, who is not an attorney, prepared, in accordance with

the earnest money agreement, escrow instructions, a promissory note, a statutory warranty deed, and a modification of the promissory note.

The selection and drafting of such documents is the work of lawyers and is not to be performed by laymen. We recognized in *In re Droker,* 59 Wn.2d 707, 719, 370 P.2d 242 (1962) that preparation of legal forms is the practice of law. We explained our position at greater length in *Washington State Bar Ass'n v. Great W. Union Fed. Sav. & Loan Ass'n,* 91 Wn.2d 48, 55, 586 P.2d 870 (1978), where we held that

> the selection and completion of form legal documents, or the drafting of such documents, including deeds, mortgages, deeds of trust, promissory notes and agreements modifying these documents constitutes the practice of law.

More recently, we reaffirmed our commitment "'to protect the public from the activity of those who, because of lack of professional skills, may cause injury whether they are members of the bar or persons never qualified for or admitted to the bar.'" *Hagan & Van Camp, P.S. v. Kassler Escrow, Inc.,* 96 Wn.2d 443, 447, 635 P.2d 730 (1981), quoting *Great Western,* at 60. We invalidated in *Hagan* legislation (RCW 19.62) by which the Legislature sought to authorize laymen to perform legal tasks relating to real estate transactions.

If any explanation of our position were needed on this matter, this case surely provides it. Plaintiffs were exploited by a less than scrupulous businessman who contrived to obtain clear title to plaintiffs' property and proceeded immediately to encumber it. Plaintiffs did not understand that, because the sale was unsecured, they would have no recourse against the property if the purchaser defaulted. They proceeded blindly into the transaction, unaware of the pitfalls which awaited them. An attorney, trained to be aware of such pitfalls, could have restructured the transaction to avoid them. The lay escrow closer, lacking a lawyer's training, did not do so.

This court has held that a layman who attempts to

practice law is liable for negligence. *Mattieligh v. Poe,* 57 Wn.2d 203, 204, 356 P.2d 328, 94 A.L.R.2d 464 (1960). The duties of an attorney practicing law are also the duties of one who without a license attempts to practice law. *Burien Motors, Inc. v. Balch,* 9 Wn. App. 573, 513 P.2d 582 (1973).

Escrow agents who have engaged in the unauthorized practice of law have been held liable for their negligence in at least two cases. In *Andersen v. Northwest Bonded Escrows, Inc.,* 4 Wn. App. 754, 484 P.2d 488 (1971), an escrow agent drew up a mortgage which contained a provision that it was not to be recorded until after the recording of another mortgage. The Court of Appeals held that the failure of the escrow agent to advise the vendors of their peril in not recording the mortgage constituted a failure to conform to the standard of care observed by a reasonable attorney. 4 Wn. App. at 757–58.

An escrow agent was held liable for negligence in *Hecomovich v. Nielsen,* 10 Wn. App. 563, 518 P.2d 1081 (1974). The escrow agent prepared a real estate contract in which he failed to make provision for certain personalty. The court held that preparation of the contract constituted the unauthorized practice of law, and rendered the escrow agent liable for any failure to observe an attorney's standard of care. Expert testimony on the standard was unnecessary; the trial judge could take judicial notice of what was reasonable. Failure to provide for personalty in the real estate contract was such an obvious breach that negligence could be determined as a matter of law.

Transamerica seeks to avoid such liability in the present case by relying on the principle that an escrow agent is limited to the terms of his instructions and therefore has no duty to advise a party to a closing of any attendant risks. The leading authority for this proposition in Washington is *National Bank of Wash. v. Equity Investors,* 81 Wn.2d 886, 506 P.2d 20 (1973). In that case, an escrow agent prepared a subordination agreement which subordinated the vendor's security interest in the realty to that of another party. The vendor claimed that the escrow agent breached

its duty to him by failing to advise of the effects of the subordination agreement. This court held otherwise. We stated the general rule

> that an escrow agent or holder becomes liable to his principals for damage proximately resulting from his breach of the instructions, or from his exceeding the authority conferred on him by the instructions.

81 Wn.2d at 910. The court then proceeded to the conclusion that the escrow agent "was not authorized to practice law nor under any duty to advise [the principal] to consult further with his own lawyer". 81 Wn.2d at 911.

A similar result was reached in respect of an escrow agent in *Wegg v. Henry Broderick, Inc.,* 16 Wn. App. 589, 557 P.2d 861 (1976). In that case, a real estate broker was held liable for failing to inform his clients of a provision prohibiting forfeiture in a real estate contract. The broker had selected the form of the contract, but it had been drawn up by an escrow agent. 16 Wn. App. at 591. The Court of Appeals noted without discussion or authority that the escrow agent had no liability because "he had a duty to obey the escrow instructions and the duty not to interfere with the transaction between the parties". 16 Wn. App. at 595.

In neither case, however, was it argued that preparation of documents by the escrow agent constituted the practice of law. Therefore neither *Equity Investors* nor *Wegg* dealt with the implications of holding an escrow agent to the standard of an attorney. In the case before us, where this issue is squarely presented, we must consider the duties of an attorney who acts as an escrow agent.

In addition to the duty to follow the escrow instructions, a duty which applies to all escrow agents whether attorneys or lay persons, an attorney escrow agent must also meet the standards of the legal profession, including those standards set forth in the Code of Professional Responsibility. Among the duties imposed by this code is the duty to refuse to accept or to continue employment if the interests of another client may impair the independent professional

judgment of the lawyer. CPR DR 5–105. The Disciplinary Rules specifically provide in CPR DR 5–105:

(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5–105(C).

(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5–105(C).

(C) In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

An amplification of these rules by the Ethical Considerations is of particular significance to the matter before us.

In those instances in which a lawyer is justified in representing two or more clients having differing interests, it is nevertheless essential that each client be given the opportunity to evaluate his need for representation free of any potential conflict and to obtain other counsel if he so desires. Thus before a lawyer may represent multiple clients, he should explain fully to each client the implications of the common representation and should accept or continue employment only if the clients consent. If there are present other circumstances that might cause any of the multiple clients to question the undivided loyalty of the lawyer, he should also advise all of the clients of those circumstances.

CPR EC 5–16.

■ As the case before us dramatically illustrates, an attorney who acts as an escrow agent for the parties to a real estate transaction is placed in the position of representing differing interests. The buyer's interest in obtaining an unsecured sale was diametrically opposed to the seller's interest in securing full payment of the purchase price. The

potential for such adversity of interests exists in every real estate transaction. Therefore, while the attorney's duty as an escrow agent requires him to exercise strict impartiality between the parties, his duties as an attorney require him to provide each client "the opportunity to evaluate his need for representation free of any potential conflict and to obtain other counsel if he so desires". CPR EC 5–16. Accordingly, an attorney acting as an escrow agent has a duty to inform the parties to the real estate closing of the advisability of obtaining independent counsel. This duty to inform, which extends equally to both parties to the closing, in no way conflicts with the attorney escrow agent's duty of impartiality.

The standards that govern attorneys also apply to lay escrow agents who engage in the unauthorized practice of law. In the present case, the lay escrow agent employed by Transamerica breached the duty by failing to inform plaintiffs of the advisability of obtaining legal representation. The trial court was therefore correct in granting plaintiffs' motion for summary judgment on the issue of liability.

■ The trial court was also correct in ruling that Transamerica's breach of duty was a proximate cause of plaintiffs' loss. Where the facts are undisputed and do not admit reasonable differences of opinion, the question of proximate cause is one of law subject to review by this court. *LaPlante v. State,* 85 Wn.2d 154, 159–60, 531 P.2d 299 (1975). There is no dispute as to the material facts of the transaction before us. Had plaintiffs been given the opportunity to evaluate their need for independent counsel, the only reasonable conclusion is that they would have consulted counsel. Moreover, unless incompetent, such counsel could only have advised plaintiffs of the folly of transacting an unsecured sale of realty. Plaintiffs' loss would thereby have been avoided. There being no other reasonable conclusion possible from the facts before us, we determine that Transamerica's breach of duty was a proximate cause of plaintiffs' loss. The trial court properly granted summary judgment on the issue of proximate cause.

We turn now to consider whether the trial court was correct in determining that Transamerica's unauthorized practice of law was a violation of the Consumer Protection Act (RCW 19.86) for which plaintiffs had a private right of action.

The Consumer Protection Act prohibits unfair or deceptive trade practices. "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." RCW 19.86.020. Persons who are injured by such prohibited practices may bring a private action to recover damages and the costs of the suit, including attorney fees.

> Any person who is injured in his business or property by a violation of RCW 19.86.020 . . . may bring a civil action in the superior court to enjoin further violations, to recover the actual damages sustained by him, or both, together with the costs of the suit, including a reasonable attorney's fee, and the court may in its discretion, increase the award of damages to an amount not to exceed three times the actual damages sustained: *Provided,* That such increased damage award for violation of RCW 19.86.020 may not exceed one thousand dollars.

RCW 19.86.090. We have held that in order for a private individual to bring such an action under RCW 19.86, the conduct complained of must "(1) be unfair or deceptive; (2) be within the sphere of trade or commerce; and (3) impact the public interest". *Anhold v. Daniels,* 94 Wn.2d 40, 45, 614 P.2d 184 (1980). The third of these requirements, impact on the public interest, may be established by a showing that

> (1) the defendant by unfair or deceptive acts or practices in the conduct of trade or commerce has induced the plaintiff to act or refrain from acting; (2) the plaintiff suffers damage brought about by such action or failure to act; and (3) the defendant's deceptive acts or practices have the potential for repetition.

*Anhold,* 94 Wn.2d at 46.

We hold that all these requirements are satisfied in this case. First, Transamerica's unauthorized practice of law was

unfair and deceptive. For conduct to be unfair or deceptive, it is not necessary that an intent to deceive be shown, so long as the action has the capacity to deceive a substantial portion of the public. *Haner v. Quincy Farm Chems., Inc.,* 97 Wn.2d 753, 759, 649 P.2d 828 (1982). Transamerica's conduct in engaging in the practice of law certainly has the capacity for such deception. Potential clients might readily and quite reasonably believe that Transamerica's closing agents were qualified to provide the expertise that could be expected from a lawyer. Such a belief, though reasonable, is not well founded. In fact, the record is clear that the closing agents possessed no such expertise. Transamerica's conduct was therefore unfair and deceptive. As for the second requirement, the conduct is clearly within the sphere of trade or commerce, being within the course of business of Transamerica, a large and important commercial corporation.

Finally, the three criteria for establishing the third requirement, impact upon the public interest, are satisfied in this case. Transamerica's engaging in the unauthorized practice of law induced plaintiffs to proceed with the real estate transaction without consulting independent legal counsel. Plaintiffs suffered damage because of their failure to consult counsel, who would have informed them of the dangers inherent in the transaction. And Transamerica's unauthorized practice of law, occurring as it did in the course of Transamerica's escrow business, certainly has the potential for repetition.

This case is distinguishable from *Lightfoot v. MacDonald,* 86 Wn.2d 331, 544 P.2d 88 (1976) where the conduct complained of was an isolated breach of an attorney's duty of care which was unlikely to be repeated. In the present case, the record indicates that Transamerica's business of real estate closings routinely involved the preparation of documents constituting the unauthorized practice of law.

The *Anhold v. Daniels* criteria having been satisfied in this case, it was therefore proper for the trial court to hold that Transamerica had violated the Consumer Protection

Act by engaging in the unauthorized practice of law.

The third issue before us is whether the trial court erred in determining the extent of plaintiffs' damages resulting from Transamerica's breach of duty. The trial court based the amount of damages on the value of the hypothetical security interest plaintiffs would have received had they sold the property subject to a deed of trust. In reaching this conclusion, the trial court followed *Ferrell v. Cronrath*, 67 Wn.2d 642, 409 P.2d 472 (1965). In that case, the plaintiffs were deprived of their security interest in a piece of real estate through the negligence of an attorney who failed to make a necessary filing. The appropriate measure of damages in that case was held to be the value of plaintiffs' security interest in the property. The trial court had valued the security interest by determining the median between the highest and lowest estimates by witnesses of the value of the property. We upheld this determination. The only distinction between *Ferrell* and the case before us is that in *Ferrell* the plaintiffs obtained a security interest which was rendered unenforceable by the defendant's negligence, whereas in the present case plaintiffs did not obtain a security interest at all. We perceive no reason this difference should compel a result different from that in *Ferrell*. Accordingly, we uphold the trial court's determination of damages.

The final issue before us is the award of attorney fees under RCW 19.86.090. The trial court calculated the reasonable attorney fee by means of a formula developed by the United States Court of Appeals in *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973). Another federal court recently summarized this method of fee calculation:

Under this method, there are two principal steps to computing an award of fees. First, a "lodestar" fee is determined by multiplying a reasonable hourly rate by the number of hours reasonably expended on the lawsuit. Second, the "lodestar" is adjusted up or down to reflect factors, such as the contingent nature of success in the

lawsuit or the quality of legal representation, which have not *already* been taken into account in computing the "lodestar" and which are shown to warrant the adjustment by the party proposing it.

*Miles v. Sampson,* 675 F.2d 5, 8 (1st Cir. 1982).

The trial court in the present case based its calculations under the *Lindy* formula on information supplied in affidavits by plaintiffs' two attorneys, and on testimony of several other attorneys called as expert witnesses at the fee hearing. In their affidavits, plaintiffs' attorneys provided detailed breakdowns of the time spent on the litigation and specified the hourly rates normally charged clients. It was not disputed that these hourly rates were reasonable. The lodestar figure of $19,261 was calculated by multiplying the number of hours worked by each attorney by their respective hourly rates. This figure was increased by 50 percent to reflect the contingent nature of the action and by a further 50 percent to recognize the high quality of the attorneys' work. These increments doubled the lodestar figure to $38,522. To this figure, the court added $4,283 attorney fees incurred in the determination of the fee award, bringing the total fee award to $42,805. Our review of this award requires us to consider a substantial body of authority, principally federal, which has dealt with the often vexing issue of reasonable attorney fees.

We begin with the statute which authorizes this fee award. RCW 19.86.090 is one of several statutes in this state which allows the recovery of attorney fees by the prevailing party. *See* Talmadge, *The Award of Attorneys' Fees in Civil Litigation in Washington,* 16 Gonz. L. Rev. 57, 77 app. 1 (1980). Like most if not all of these statutes, RCW 19.86.090 provides no specific indication of how attorney fees are to be calculated. Another provision of the Consumer Protection Act provides some general guidance. RCW 19.86.920 exhorts us to liberally construe the act, "that its beneficial purposes may be served". Moreover, in so construing the act, we are to "be guided by the interpretation given by the federal courts to the various federal

statutes dealing with the same or similar matters". RCW 19.86.920.

We considered this issue briefly in *State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.,* 87 Wn.2d 298, 314–15, 553 P.2d 423 (1976), in which we approved an award of fees in litigation which spanned 4 years, involving two appeals, a number of extraordinary writs, and a 9–week trial. In that case, the Attorney General was awarded fees and costs of $389,258.20 from each of the three defendants, in addition to civil penalties of $289,000 from two defendants and $279,000 from the third. In approving the fee award, we did not discuss the formula whereby this award was calculated. We noted, however, that the purpose of the fee award is to encourage active enforcement of the Consumer Protection Act and that an award of fees will be overturned only for a manifest abuse of discretion.

In the absence of any other authority in this state, and given the direction of RCW 19.86.920, it is appropriate to consider the federal court's approach to attorney fee awards.

Well over 100 federal statutes authorize the award of reasonable attorney fees to successful litigants. Note, *Computing "Reasonable" Attorneys' Fees: The Copeland v. Marshall Trilogy,* 19 Hous. L. Rev. 339 (1982). Little guidance is provided in these statutes as to what constitutes a reasonable fee, and consequently a substantial body of case law has developed. Many federal cases, particularly the older ones, approve fee awards under these statutes without any articulated reasons whatever. *See* Berger, *Court Awarded Attorneys' Fees: What is "Reasonable"?,* 126 U. Pa. L. Rev. 281, 284 (1977).

Recently, however, the federal courts of appeals have required that district courts articulate the reasons for fee awards so as to render those awards susceptible to appellate review. Several courts have adopted lists of factors to be considered by the trial judge in making a fee determination. The most frequently cited of such lists is based on guidelines for private fee arrangements set forth in the

Model Rules of Professional Conduct (1982). *See* CPR DR 2–106. These factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment; (5) the customary fee in the community for similar work; (6) the fixed or contingent nature of the fee; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Copeland v. Marshall,* 641 F.2d 880, 889 (D.C. Cir. 1980); *Johnson v. Georgia Hwy. Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir. 1974). (These factors are similar to those we consider in determining the reasonable value of professional services in a quantum meruit claim. *See Kimball v. PUD 1,* 64 Wn.2d 252, 257, 391 P.2d 205 (1964).)

This approach has been criticized as providing no more than illusory guidance to trial judges in setting reasonable fees.

> The fundamental problem with an approach that does no more than assure that the lower courts will consider a plethora of conflicting and at least partially redundant factors is that it provides no analytical framework for their application. It offers no guidance on the relative importance of each factor, whether they are to be applied differently in different contexts, or, indeed, how they are to be applied at all.

(Footnotes omitted.) 126 U. Pa. L. Rev. at 286–87, quoted in *Copeland v. Marshall,* at 890. Other federal courts have refined the process of calculating reasonable fees by incorporating "the twelve factors into an analytical framework that can be easily applied by trial courts and that will make possible meaningful appellate review". *Copeland v. Marshall,* at 890. The most widely accepted of such analytical frameworks is that developed by the Third Circuit Court of Appeals in *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 487 F.2d 161 (3d Cir. 1973),

and we conclude that this is the appropriate formula by which to calculate fees under RCW 19.86.090.

We now take the opportunity to elaborate in some detail on the operation of the formula under RCW 19.86.090. We have found very helpful the District of Columbia Circuit Court of Appeals discussion of the *Lindy* formula in *Copeland v. Marshall* and, except where we note otherwise, the following discussion is based substantially on the majority's opinion in that case.

The application of the *Lindy* formula begins with the calculation of a lodestar figure. The trial court must determine the number of hours reasonably expended in the litigation. To this end, the attorneys must provide reasonable documentation of the work performed. This documentation need not be exhaustive or in minute detail, but must inform the court, in addition to the number of hours worked, of the type of work performed and the category of attorney who performed the work (*i.e.,* senior partner, associate, etc.). The court must limit the lodestar to hours reasonably expended, and should therefore discount hours spent on unsuccessful claims, duplicated effort, or otherwise unproductive time.

The total number of hours reasonably expended is multiplied by the reasonable hourly rate of compensation. Where the attorneys in question have an established rate for billing clients, that rate will likely be a reasonable rate. The attorney's usual fee is not, however, conclusively a reasonable fee and other factors may necessitate an adjustment. *See, e.g., Chrapliwy v. Uniroyal, Inc.,* 670 F.2d 760 (7th Cir. 1982). In addition to the usual billing rate, the court may consider the level of skill required by the litigation, time limitations imposed on the litigation, the amount of the potential recovery, the attorney's reputation, and the undesirability of the case. The reasonable hourly rate should be computed for each attorney, and each attorney's hourly rate may well vary with each type of work involved in the litigation.

A simple table illustrating the calculation of a lodestar

after consideration of all these factors is suggested by the majority in *Copeland v. Marshall,* 641 F.2d at 892:

| Attorney & Type of Work | Hours | Rate | Total |
|---|---|---|---|
| Senior Partner: Court appearances | 17.3 | $95 | $1,643.50 |
| Senior Partner: Review of pleadings | 39.2 | $85 | $3,332.00 |
| Junior Associate: Research & drafting | 87.6 | $50 | $3,504.00 |
| Junior Associate: Depositions | 35.5 | $40 | $1,420.00 |
| | | | $9,899.50 |

Thus, the "lodestar" fee in this hypothetical is $9,899.50.

After the lodestar has been calculated, the court may consider the necessity of adjusting it to reflect factors not considered up to this point. "The burden of justifying any deviation from the 'lodestar' rests on the party proposing the deviation." *Copeland v. Marshall,* 641 F.2d at 892. Adjustments to the lodestar are considered under two broad categories: the contingent nature of success, and the quality of work performed.

The purpose of the contingency adjustment is well stated by Berger in 126 U. Pa. L. Rev. at 324–25.

> Unless an attorney has some agreement with the client guaranteeing compensation regardless of the outcome, the attorney will receive no fee in the event that the suit does not succeed in some manner. In these cases counsel bear the risk that they will not be compensated at all for their time and effort. The experience of the marketplace indicates that lawyers generally will not provide legal representation on a contingent basis unless they receive a premium for taking that risk.

(Footnote omitted.) In adjusting the lodestar to account for this risk factor, the trial court must assess the likelihood of success at the outset of the litigation. This is necessarily an imprecise calculation and must largely be a matter of the trial court's discretion. Nevertheless, certain guiding principles should be followed. Most important, "the contingency adjustment is designed solely to compensate for the possibility . . . that the litigation would be unsuccessful and

that no fee would be obtained". *Copeland v. Marshall*, 641
F.2d at 893. Therefore, the risk factor should apply only
where there is no fee agreement that assures the attorney of
fees regardless of the outcome of the case. Moreover, to the
extent, if any, that the hourly rate underlying the lodestar
fee comprehends an allowance for the contingent nature of
the availability of fees, no further adjustment duplicating
that allowance should be made. Finally, the risk factor
should be applied only to time expended before recovery is
assured; for example, time expended in obtaining the fees
themselves should not be adjusted.

The second basis on which the lodestar might be
adjusted is to reflect the quality of work performed. This is
an extremely limited basis for adjustment, because in vir-
tually every case the quality of work will be reflected in the
reasonable hourly rate.

> A quality adjustment is appropriate only when the rep-
> resentation is unusually good or bad, *taking into account*
> *the level of skill normally expected* of an attorney com-
> manding the hourly rate used to compute the "lodestar."

*Copeland v. Marshall*, 641 F.2d at 893. In exceptional
cases, however, the lodestar might be adjusted, either up or
down, to reflect the quality of work.

We proceed now to consider whether the trial court
abused its discretion in applying the *Lindy Bros. Builders,*
*Inc. v. American Radiator & Standard Sanitary Corp.* for-
mula. The documentation supplied by the attorneys in
support of their claim for fees was sufficient to allow the
computation of the hours expended in the litigation. The
trial court, however, noted in its findings of fact that there
was some duplication of work reflected in the hours claimed
by the attorneys. The court disregarded this duplication in
calculating the lodestar because expert witnesses had testi-
fied that plaintiffs' attorneys had spent less time than
might be expected in this litigation. This is not appropriate.
The purpose of the lodestar is to provide an objective basis
for assessing a reasonable fee. The starting point for the
calculation of the lodestar is the number of hours reason-

ably expended in the litigation. In calculating this figure, the court must discount any duplicated or wasted effort by the attorneys. The attorney's efficiency, his ability to produce results in the minimum time, is a factor which will be reflected by the reasonable hourly rate. It is therefore unnecessary to consider the attorney's efficiency in determining the number of hours reasonably expended on the case.

The trial court determined that the normal hourly rate charged by the attorneys was the appropriate reasonable hourly charge for the purpose of computing the lodestar. No objection was made to this conclusion and it does not appear to be an abuse of discretion.

After computing the lodestar, the court doubled it by applying two incremental factors. First, the court increased the lodestar by 50 percent to reflect the contingent nature of success. The court heard testimony from three practicing attorneys who testified as expert witnesses on the contingencies involved in the litigation. First, plaintiffs' attorneys made a contingent fee agreement with their clients, entitling the attorneys to one–third of any recovery. Unless plaintiffs prevailed, their attorneys would receive no fee. Second, an apparent impediment to recovery was case law cited by Transamerica for the proposition that an escrow agent's duty is limited to following the escrow instructions. We have explained elsewhere in this opinion that these authorities do not bar recovery in this case, but we recognize that we have not previously been called upon to decide this particular issue. Third, the witnesses indicated that the case presented novel issues under the Consumer Protection Act, which created a risk that the attorneys would not be entitled to fees under RCW 19.86.090, and would consequently be forced to look solely to the contingent fee agreement with that client. Finally, one attorney witness, whose practice was 95 percent contingent fee work, testified that it was necessary to recover up to twice the normal hourly rate in successful cases when fees were contingent upon success.

The trial court concluded, after hearing this testimony, that 50 percent was the appropriate increment to reflect the contingent nature of the recovery of fees. The court placed special emphasis on the testimony that an attorney whose practice is 95 percent contingent fee work must obtain double the usual hourly rate for cases in which he prevails. The court then pointed out that the practices of plaintiffs' attorneys were not as heavily reliant on contingent fees and that therefore the appropriate incremental factor was 50 percent.

As we have discussed, however, the appropriate incremental factor should be determined, not by the percentage of contingent fee work performed by the attorney, but by reference to the chances of success in the litigation. Nevertheless, despite our disagreement with the trial court in this respect, we conclude that a 50 percent premium to reflect the contingent nature of success in this case does not appear to be an abuse of discretion.

The trial court also adjusted the lodestar upward to reflect the quality of the work performed. Nothing in the record suggests that the work performed by plaintiffs' attorneys was significantly better than could be expected from attorneys who commanded the hourly rates used to calculate the lodestar. We conclude, therefore, that it was error for the trial court to adjust the lodestar to reflect the quality of work.

Our resolution of this issue requires that the trial court reconsider the matter of attorney fees to calculate a lodestar figure which does not include time for duplicated work or other unproductive time. The lodestar thus obtained may be adjusted to reflect the contingent nature of the litigation. No adjustment should be made for the quality of work.

Accordingly, the trial court is affirmed, except as to the determination of attorney fees, and the case is remanded for action consistent with this opinion.

Plaintiffs properly requested attorney fees on appeal pursuant to RAP 18.1(b). They are therefore entitled to

reasonable attorney fees incurred in this appeal and we direct that the amount of such fees be determined by the trial court on remand. RAP 18.1(e).

WILLIAMS, C.J., and STAFFORD and BRACHTENBACH, JJ., concur.

DOLLIVER, J., concurs in the result.

DORE, J. (concurring in part, dissenting in part)—I concur with the majority except for the discussion regarding the determination of a reasonable attorney fee under RCW 19.86.090, the Consumer Protection Act. I would award plaintiffs an attorney fee of $19,261.

RCW 19.86.090 provides for an attorney fee by the prevailing party,

> including a *reasonable* attorney's fee, and the court may in its discretion, increase the award of damages to an amount not to exceed three times the actual damages sustained: *Provided,* That such increased damage award for violation of RCW 19.86.020 may not *exceed* one thousand dollars.

(Italics mine.) RCW 19.86.090 limits the court to determining only a "reasonable" attorney fee and in its discretion awarding an additional amount for damages, up to $1,000.

The subject case involved a maximum recovery of $35,000,[1] and the plaintiffs' attorneys took the case on a contingent fee of one-third of the recovery, or $11,666.[2] The motion judge's written memorandum opinion indicates the plaintiffs' summary judgment motion was won on established case law. *See Washington State Bar Ass'n v. Great W. Union Fed. Sav. & Loan Ass'n,* 91 Wn.2d 48, 586 P.2d 870 (1978); *In re Droker,* 59 Wn.2d 707, 370 P.2d 242 (1962); *Anhold v. Daniels,* 94 Wn.2d 40, 614 P.2d 184

---

[1] The real estate contract provided for a purchase price of $45,000; however, $10,000 was paid down so seller's loss was $35,000.

[2] The Contingent Fee Agreement (exhibit 54) states:

"A. 33% of the total recovery or attorneys fees computed upon the total number of hours expended at the hourly rate of $60.00 per hour, whichever is less."

(1980). Attorney fees were awarded under the Consumer Protection Act.

After Superior Court Judge Clarke granted plaintiffs summary judgment for $35,000, a 2½-day trial was conducted for the purpose of awarding damages and a reasonable attorney fee. Superior Court Judge Shields granted $1,000 in punitive damages, the maximum under the statute. He also awarded a reasonable attorney fee of $19,261, which he doubled to $38,522 for the attorneys who attained the original judgment before Judge Clarke, then awarded an additional attorney fee of $4,283 to plaintiffs' attorneys for their services in the 2½-day trial. After reading all the evidence and testimony, and liberally construing the words "reasonable attorney's fee," the trial court found that a reasonable attorney fee under RCW 19.86.090 was $19,261. This amount was then doubled because it was a *contingent* fee and constituted *quality* work. RCW 19.86.090 provides only for a "reasonable" attorney fee and an additional $1,000 for punitive damages. This statute is thus unlike the federal antitrust act, which triples damages without limitation.

RCW 19.86.090 does not authorize enhancement of a "reasonable attorney's fee" by 50 percent because it was a contingent fee, plus additional enhancement of 50 percent because of the quality of the work.

The subject case was never a $100,000 case, but only a $35,000 one. In an action not brought under the Consumer Protection Act, plaintiffs' attorneys would have received a fee of $11,666. If the contingent fee was enhanced 100 percent, they would have received a fee of $23,332. The trial court awarded a fee of $19,261 as a reasonable fee, raising the amount of plaintiffs' attorneys' agreed contingent fee in excess of 50 percent. The court then enhanced this fee another 50 percent because it is a contingent fee. I find this a "manifest abuse of discretion," requiring an overturning of the court's award under *State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.*, 87 Wn.2d 298, 314, 553 P.2d 423 (1976).

State law prohibits punitive damages.[3] Yet Judge Shields, in making his award for attorney fees, stated:

> The deceptiveness in this situation about not referring to a lawyer does not warrant *punitive* damages in one sense, and yet in another sense it does.

(Italics mine.) Second Supplemental Clerk's Papers, at 81.

He concluded he would assess punitive damages, and did so up to the $1,000 as provided in the Consumer Protection Act. He also awarded a *reasonable* attorney fee of $19,261. He had no additional authority to do anything further under RCW 19.86.090. It was inappropriate to use the award of a "reasonable" attorney fee as a vehicle to assess punitive damages.

In the present case, I would affirm an award of $19,261, the amount the trial judge found to be a reasonable attorney fee. I would deny plaintiff the additional $4,283 awarded for presenting evidence as to the reasonableness of the fee. Plaintiffs' attorneys have already received a generous fee for a relatively modest judgment, without the burden of a trial. The contingent fee of $11,666 has already been enhanced more than 50 percent by increasing it to $19,261.

The majority here awards attorney fees in the subject case in the area of $32,000 to $35,000 for a $35,000 judgment. Liability was established on the summary judgment calendar without a trial. The majority says this is a reasonable attorney fee. I wonder if they would say the same thing if the client had to pay it rather than a large corporate defendant.

### CONCLUSION

As the result of these large fees, the practice of law in our state for the poor and middle-income person is becoming so expensive that in many cases it is prohibitive, and such

---

[3]On March 11, 1961, the Legislature passed a law providing for punitive damages (Laws of 1961, ch. 97). This statute remained on the books only 19 days and was repealed in its entirety on March 30, 1961 (Laws of 1961, 1st Ex. Sess., ch. 27).

people are looking for other means to resolve their legal problems. One wonders whether the adversary system can continue or whether we should look to a faster, cheaper method of disposing of claims such as arbitrations and settlement conferences. Hopefully such arbitrations and settlement conferences of the future will be under the auspices of lawyers and judges. However, as some lawyers continue to price themselves out of the market, we may discover too late that laymen can effectively handle arbitrations and settlement conferences with minimum help from the legal profession.

I would remand to the trial court for entry of judgment in accordance with the provisions of this opinion.

DIMMICK, J. (concurring in part, dissenting in part)—I do not agree with either the majority's or Justice Dore's discussion of the award of attorney fees, although I concur in the balance of the majority's opinion.

RCW 19.86.090, similar to many federal statutes, allows a prevailing party to recover "a reasonable attorney's fee". The statute does not give any guidance, however, as to what is "reasonable". Generally we are to construe liberally the provisions of the Consumer Protection Act and look to federal courts for guidance in similar matters. RCW 19.86-.920. I agree with the majority that these exhortations apply to our interpreting RCW 19.86.090 as well as other provisions of the act. However, I do not agree that we should adopt the "lodestar" method of *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973) to determine reasonable fees.

Rather, I would adopt the approach of *Johnson v. Georgia Hwy. Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). In *Johnson* the court enunciated the following 12 factors to be considered by the trial court in calculating a fee award:

(1) The time and labor required. . . .
(2) The novelty and difficulty of the questions. . . .
(3) The skill requisite to perform the legal service properly. . . .

(4) The preclusion of other employment by the attorney due to acceptance of the case. . . .

(5) The customary fee. . . .

(6) Whether the fee is fixed or contingent. . . .

(7) Time limitations imposed by the client or the circumstances. . . .

(8) The amount involved and the results obtained. . . .

(9) The experience, reputation, and ability of the attorneys. . . .

(10) The "undesirability" of the case. . . .

(11) The nature and length of the professional relationship with the client. . . .

(12) Awards in similar cases.

(Italics omitted.) 488 F.2d at 717–19. Other federal circuit courts have adopted and applied these guidelines allowing the district courts to exercise their discretion. *See, e.g., Palmigiano v. Garrahy,* 616 F.2d 598, 600–01 (1st Cir.), *cert. denied,* 449 U.S. 839 (1980); *Barber v. Kimbrell's, Inc.,* 577 F.2d 216, 226 (4th Cir.), *cert. denied,* 439 U.S. 934 (1978); *Fountila v. Carter,* 571 F.2d 487, 496 (9th Cir. 1978); *In re Permian Anchor Servs., Inc.,* 649 F.2d 763, 768 (10th Cir. 1981). The *Johnson* factors are similar to those which the courts of this state already apply in determining the reasonable value of an attorney's services in a quantum meruit claim. *See, e.g., Kimball v. PUD 1,* 64 Wn.2d 252, 257, 391 P.2d 205 (1964); CPR DR 2–106. Thus the trial courts should have little or no difficulty in applying the *Johnson* factors in consumer protection cases.

The methodology for calculating fees enunciated in *Lindy* is not a clear trend requiring us to drastically change our case law. Nor is it without well deserved criticism. *See Copeland v. Marshall,* 641 .F.2d 880, 908–30 (D.C. Cir. 1979) (Wilkey, J., dissenting).

The obvious purpose underlying the attorney's fee provision in the Consumer Protection Act is to encourage deserving litigants to seek judicial relief in order to vindicate consumer rights. To encourage this purpose, the Legislature undoubtedly intended that a "reasonable" attorney's

fee award be sufficient to attract competent counsel. I believe the trial courts in exercising their discretion with the *Johnson* factors before them will be able to accomplish the provision's purpose. The lodestar method, having no relation to the amount involved, may lead to an attorney's fee which is equal to or exceeds the judgment recovered—a result which produces a windfall for the attorney and has no relation to the purpose of the statute.

I would remand this case to allow the trial court to consider the 12 *Johnson* factors in determining a reasonable attorney's fee.

CUNNINGHAM, J. Pro Tem., concurs with DIMMICK, J.

Reconsideration denied February 8, 1984.