Haggerty, J.

BACKGROUND

The Massachusetts Conveyers Association, Inc. and seven other bar associations filed this action against the defendants on May 17, 1996 in the Suffolk Superior Court. The plaintiffs allege that the defendants are engaged in the unauthorized practice of law in violation of G.L.c. 221, §§46, 46A. They seek a declaratory judgment that the conveyancing acts and practices of the defendants violate G.L.c. 221, §§46, 46A. The plaintiffs also seek a permanent injunction restraining the defendants from the practice of real estate conveyancing and from holding themselves out to the public as lawfully able to perform such services.
After a bench trial, I make the following factual findings based upon the testimony and exhibits, and the reasonable inferences drawn therefrom.

FACTUAL FINDINGS

The plaintiffs are the Massachusetts Conveyancers Association, Inc. and seven (7) additional bar associations (which will be referenced jointly as “the bar associations”). The Defendants are Colonial Title & Escrow, Inc., a Massachusetts Corporation and Colonial Title & Escrow, Inc., a Rhode Island Corporation (which will be referenced collectively as “Colonial”). Colonial’s principal place of business is 132 Central Street, Foxboro, Massachusetts. John S. Sweeny (“Sweeny”) is the president of Colonial and Joseph Párente (“Párente”) is the vice-president. Sweeny and Párente are the only directors and stockholders of Colonial and neither is an attorney. David B. Carroll (“Carroll”), who has been a Massachusetts attorney since 1981, is the resident agent of Colonial and occupies Colonial’s space to conduct his law practice.
Colonial provides services to mortgage lenders in connection with residential real estate transactions that involve either the purchase or refinance of property. Prior to 1996[3] and the initiation of this lawsuit, Colonial wore dual hats in these transactions. It operated as an issuing agent for a number of title insurance companies and in this capacity issued title insurance policies after it determined that there was clear title to the property. For this work, Colonial received 70% of the premium cost as its commission. Most of Colonial’s *634 income was derived from writing the title insurance policies. Colonial also operated as a closing agent for the mortgage lenders in which it provided closing services up to and including the closing. As a closing agent, Colonial charged $649 for its services which is less than the average fee charged by an attorney for the same services. Most of the closings were conducted by Párente while Sweeny primarily managed Colonial’s business and conducted an occasional closing. Carroll occasionally conducted the closings in connection with the purchase of real estate. Carroll is a solo practitioner who provided legal services to Colonial in exchange for space and the use of equipment. Carroll operated as Colonial’s corporate attorney and trained the.Colonial staff in residential real estate transactions. After 1996 and the initiation of this lawsuit, Carroll became the supervising attorney for all closings such that none may be conducted without his supervision.
In order to become an issuing agent for a title insurance company one must obtain an insured closing letter from the title insurance company. Prior to initiation of this lawsuit, Colonial was an issuing agent for a number of companies, including First American. Since 1996 and the initiation of this lawsuit, the insured closing letters from the title insurance companies were withdrawn and renegotiated at least with First American, with the agreement that the closings would be conducted under the supervision of Carroll as the closing agent. Carroll reviews the title and conducts the real estate closings involving purchases of residential real estate and Colonial reviews the title and conducts the closings in refinance transactions. Colonial has continued to operate as the title insurance agent. The closing fee is paid to Colonial in all closings, including those conducted by Carroll. Colonial then pays Carroll.
When Colonial acts as closing agent for the lender it has a sequence of operation that is followed in every closing. Although the closing instructions differ from lender to lender, all lenders expect Colonial to take the necessary steps to insure that the lender has a valid first lien on the property. Upon the request of a mortgage lender or broker, Colonial starts the process for creating a title insurance binder for an upcoming closing on a residential property. Colonial contacts its title insurance company to ascertain whether the company has previously conducted a title search on the property. This is referred to as a “back title.” If the company has previously searched the title, Colonial orders a search from the “back title” forward. Otherwise, Colonial orders a 50-year title search. In most instances, Colonial hires an outside examiner to prepare a title abstract because it is less costly than utilizing Colonial staff to conduct the search. The lender dictates whether a 50-year search is required or whether a more limited “back title” search is sufficient. The title examiner provides Colonial with the results of the search, including copies of every deed and outstanding matter such as easements, liens and encumbrances, as well as a summary sheet of the title search. Colonial staff examines the documents to determine whether there are defects or other problems with the title and compares the documents against the summary sheet for inconsistencies. If all is in order, Colonial generates a title insurance binder which is signed by Párente or Sweeny. Colonial sends the binder to the lender. If there is a lien, an attachment or some other encumbrance, Colonial obtains the borrower’s authorization to contact the lienholder to get the lien discharged. Colonial also contacts the pertinent municipality to assure the lender that the taxes and other municipal charges are up to date. If the buyer or seller attempts to resolve the problem Colonial reviews the sufficiency of the resolution. Párente and Sweeny are familiar with some Massachusetts and federal law related to conveyancing and they consult secondary sources on real estate transactions such as the Massachusetts Practice Series. Prior to 1996, Párente or Sweeney offered to prepare new deeds and on occasion did so. Since 1996, Colonial now offers to have Carroll prepare new deeds.
When the lender notifies Colonial that the loan has been approved Colonial schedules a closing date. Upon receipt of the lender’s documents Colonial adds their own documents to the package. From the lender’s information Colonial creates a settlement statement, a business disclosure form, notice of the availability of insurance, pay-off letters for any lienholders, and an agreement to satisfy liens. Colonial reviews the lender’s documents for accuracy and consistency.
Colonial attends the closing. Most often, Párente is the closing agent and less frequently, it is either Sweeny or Carroll. At the closing, Colonial points out to the borrower the interest rate, the monthly payment, the term of the mortgage, as well as other accounting issues. The mortgage lenders expect Colonial to explain the documents to the borrower and to answer the borrower’s questions. Colonial does answer some of the borrower’s questions. The borrower signs between 30 and 50 documents. After the documents are signed, Colonial records the necessary documents at the registry of deeds following an update on the title to the moment of recording. Colonial disburses the funds for the lender to those entitled to receive them. When all is complete, Párente takes the recording information and the signed documents back to his offices where he drafts the title policy and sends it to the lender, along with the signed closing documents.
When an attorney is hired by the lender to conduct a closing the attorney engages in many of the same practices as does Colonial. An attorney is hired to ensure that the lender’s interests in the transaction are protected and perfected. When the transaction involves the sale of property, the conveyancing attor-' ney ensures that the legal interest in the property *635 identified in the purchase and sale agreement is validly conveyed from the seller to the buyer. Further, the attorney ensures that the lender and borrower satisfy their obligations under their agreements at the time of closing. When the transaction involves refinancing, the conveyancing attorney is responsible for ensuring that the lender receives a valid mortgage in the real estate which secures the loan at issue. In both instances, it is the duty of the attorney providing these legal services to ensure that the lender performs on its loan commitment and receives in return the assurance of good and clear record and marketable title to the real estate held as security for the loan. To perform his duty the attorney must perform the following tasks: comply with the lender’s commitment to the buyer and follow its closing instructions; examine and certify record title to the mortgaged property; review all title documents and other closing documents and provide them to the buyer; prepare a complete settlement statement; receive the required funds and disburse them to the proper parties at the appropriate time; record the documents and transmit them to the lender.
In a purchase transaction, evaluation of record title requires the conveyancing attorney to conduct a search of the public records, to identify those documents affecting title to the property, and to evaluate those documents in light of the law to determine if the seller of the property has good and clear record and marketable title. Depending on the circumstances, the attorney may be required to evaluate documents recorded at the registry of deeds, documents on file in the probate court and town or city hall, and documents prepared by registered land surveyors. In reviewing title to property, the lender relies on the attorney to evaluate and to ensure that some or all of the following matters have been satisfied or resolved: that all conditions of the purchase and sale agreement have been met; that the property is zoned for the current or intended use; that the property complies with all applicable zoning requirements; that flood insurance can be obtained if the property is located in a food plain zone; that the property complies with Title 5; that adequate casualty insurance is obtained; and that all taxes and municipal charges are current.
Whether for a purchase or refinance transaction, a title evaluation is a two-step process: a search for the pertinent documents and an assessment of the legal significance of those documents. It is the latter task that requires a thorough knowledge of the law. For example, an attorney must be familiar with the law relating to easements, adverse possession, attachments, bankruptcy, condominiums, divorce, leases, partnerships, liens, trusts and corporations in order to adequately evaluate title to real property. A title examination for issuance of a title insurance policy in a residential purchase transaction is the same examination that an attorney conducts when he certifies a title pursuant to G.L.c. 90, §70.

DISCUSSION

The judicial branch of government has the exclusive power to license persons to practice law and to determine what constitutes the practice of law. Opinion of the Justices, 289 Mass. 607, 612 (1935); Lowell Bar Association v. Loeb, 315 Mass. 176, 179-80 (1943). The judicial branch regulates the practice of law by controlling who is admitted to the bar, upholding the standards of practice, and prohibiting persons not in good standing in the bar from practicing law.[4] The justification for excluding from the practice of law persons either not admitted to the bar or subject to exclusion or suspension as a result of judicial discipline lies wholly in consideration of the public welfare. Matter of Keenan, 314 Mass. 544, 546-47 (1943).[5]
Although the Legislature may not extend the privilege of practicing law to persons not admitted to practice by the judiciary it may enact laws that provide limitations and penalties for the unlawful practice of law. Opinion of the Justices, 289 Mass. at 612. With certain exceptions, the Legislature has limited the practice of law by corporations or associations.
No corporation or association shall practice or appear as an attorney for any person other than itself in any court in the commonwealth or before any judicial body or hold itself out to the public or advertise as being entitled to practice law, and no corporation or association shall draw agreements, or other legal documents not relating to its lawful business, or draw wills, or give legal advice in matters not relating to its lawful business, or practice law, or hold itself out in any manner as being entitled to do any of the foregoing acts, by or through any person orally or by advertisement, letter or circular; provided, that nothing herein shall prohibit a corporation or association from employing an attorney in regard to its own affairs or in any litigation to which it is or may be a party or the insurer of a party. Any corporation or association violating this section shall be punished by a fine of not more than one thousand dollars; and every officer, agent or employee of any such corporation or association who, on behalf of the same, directly or indirectly, engages in any of the acts herein prohibited, or assists such corporation or association to do such prohibited acts, shall be punished by a fine of not more than five hundred dollars.
The provisions of this section shall not apply to a professional corporation organized to practice law under chapter one hundred and fifty-six A or to a limited liability company, whether domestic or foreign, or a general partnership, including a registered limited liability partnership registered pursuant to the laws of any state, the partners or professional employees of which company or part *636 nership who practice law in the commonwealth do so in accordance with the requirements of the supreme judicial court.
G.L.c. 221, §46. .
Whether a particular activity constitutes the practice of law is fact specific. Matter of Shoe Manufacturers Protective Association, 295 Mass. 369, 372 (1936). While a comprehensive definition would be impossible to frame, what constitutes “the practice of law,” in general, consists of:
[D]irecting and managing the enforcement of legal claims and the establishment of the legal rights of others, where it is necessary to form and to act upon opinions as to what those rights are and as to the legal methods which must be adopted to enforce them, the practice of giving or furnishing legal advice as to such rights and methods and the practice, as an occupation, of drafting documents by which such rights are created, modified, surrendered or secured . . .

Id.

In addition, the examination of statutes, judicial decisions, and departmental rulings, for the purpose of advising upon a question of law and the rendering to a client of an opinion thereon, are also part of the “practice of law.” Lowell Bar Ass’n. v. Loeb, 315 Mass. 176, 183 (1943). Conveyancing, which refers to the various functions concerning the creation, transfer and termination of an interest in real property, constitutes the practice of law. Opinion of the Justices, 289 Mass. at 613. See Massachusetts Association of Bank Counsel, Inc. v. Closings, Ltd., 1 Mass. L. Rptr. 87 (Mass.Super. 1993).
It is also necessary to note what is not the practice of law. “The occasional drafting of simple deeds, and other legal instruments when not conducted as an occupation or yielding substantial income may fall outside the practice of the law.” Opinion of the Justices, 289 Mass. at 615. Likewise, “the search of records of real estate to ascertain what may there be disclosed without giving opinion or advice as to the legal effect of what is found ...” does not constitute the practice of law. Id. Title examiners who search the records of the registry of deeds and prepare abstracts of the title detailing its history, including encumbrances and defects, are not practicing law.
Although there are no Massachusetts full-court appellate decisions directly on point with the factual issues in this case, there are decisions from other jurisdictions that address some of the issues raised by these facts.[6] Colonial relies heavily on a decision of the New Jersey Supreme Court which decided the question whether brokers and title company officers who handle all aspects of residential real estate transactions in southern New Jersey, including the closing or settlement, are engaged in the unlawful practice of law.[7] In Re Opinion No. 26 of the Committee on the Unauthorized Practice of Law, 654 A.2d 1344 (N.J. 1995). In contrast to this factual situation, the New Jersey Court dealt with a long-standing practice of non-lawyers conducting closings in the southern part of the state. The tradition and practice arose after World War II with the advent of thousands of federally financed loans made to veterans and farmers. Due to the volume of real estate transactions and the dearth of attorneys in that part of the state, brokers and title officers historically conducted all aspects of residential real estate transactions. In large measure, the conclusion of the New Jersey Supreme Court permitting the practice to continue with the condition that the parties be fully informed of the risks, was based upon long-standing tradition in that area of the state. In so ruling, the court also overruled a previous decision, New Jersey State Bar Ass’n v. Northern New Jersey Mortgage Association, 161 A.2d 257 (N.Y. 1960), on the stated grounds that in the prior case “the public interest in allowing the challenged practices to continue was nowhere, demonstrated, and certainly not -with the force of the record before us.” Opinion No. 26, 654 A.2d at 1358-59. In Massachusetts there is no long-standing practice of permitting companies like Colonial to conduct closings. Nor does the public interest require that they do so. To the contrary, the public interest demands that legal interpretation and advice be given by attorneys who are trained to do so and the public includes not only borrowers but also lenders.
The reasoning of a more recent opinion of the Supreme Court of Delaware is more consistent with our practices, opinions and statutes governing the practice of law in the context of Colonial’s role as closing agent.[8] See In the Matter of Mid-Atlantic Settlement Services, Inc., 755 A.2d 389, 2000 Del. Lexis 243 (2000). Non-attorney employees of Mid-Atlantic Settlement Services, Inc. (“Mid-Atlantic”) acted as settlement agent for various lenders in Delaware. Id. at *3. The pre-settlement and settlement activities of Mid-Atlantic employees nearly mirror those performed by Colonial.[9] Id. at *4. The Mid-Atlantic court, approving the report of the Board on the Unauthorized Practice of Law, concluded that the activities of the settlement agents constituted the practice of law. Id. at *4.[10] The Board found that lawyers are better qualified to handle settlements because they are more knowledgeable about the legal issues and more likely to identify a problem than are non-attorney closing agents. Id. at *22-25. Attorneys are held to higher ethical standards and the client’s interests are paramount. Id. at *25. At the heart of the decision in Mid-Atlantic, as in this case, was the public interest. See also Lowell Bar Association v. Loeb, 315 Mass. at 180 (citations omitted).
In preparation for the closing, Colonial reviews the lender’s closing documents for accuracy and consistency. On behalf of the lender and the title company, Colonial evaluates the title for defects and clears up those defects. It is Colonial that determines whether *637 there is a title problem and in this regard it is exercising legal judgment. Colonial is protecting the lender from its own mistakes. It generates several documents including the Real Estate Settlement Purchase Agreement (“RESPA”).
If borrowers have questions about the various legal documents at the closing Colonial answers them. By Parente’s own admission he points out “important facts” to the borrowers. Moreover, Colonial's title companies expect Colonial to answer the borrowers' questions. Parente and Sweeny could escape malpractice liability, in some instances, if they were members of the bar and offered erroneous information to the borrowers. See Page v. Frazier, 388 Mass. 55 (1983). The scope of the practice of law, however, is broader than the issue of the duty owed to an individual borrower by a lender’s attorney under Page v. Frazier. The practice of law includes the rendering of legal opinions in circumstances where an individual will rely on that opinion. As stated by the Board, and quoted by the court in Mid Atlantic, “(t]he lender [and the lender’s representative] plays a dominant role in what is principally an economic transaction for the inexperienced borrower, who is sometimes financially desperate, is routinely interested in saving expenses, and relies heavily on the lender to dictate the particulars of the settlement process.” In Re Mid-Atlantic, 2000 Del. Lexis at *7-8. Colonial is the lender’s legal representative at the closing when it acts as a closing agent and the borrower may incorrectly look to him for legal advice or explanation.
Colonial’s role as title insurance issuing agent raises some additional issues. As an issuing agent, Colonial issues policies for title insurance companies such as First American. The policies are issued for the benefit of the lender after Colonial evaluates the title and renders its opinion that the title is insurable or insurable with exclusions. Since Colonial is rendering an “opinion or advice [to the lenders and the title insurance companies] as to the legal effect of what it has found” in the title search it is practicing law. See Opinion of the Justices, 289 Mass. at 615.
Colonial argues that since the Legislature has permitted the incorporation of title companies that Colonial’s activities as issuing agent are likewise permitted. See G.L.c. 175, §47, cl. II.[11] However, one must be mindful of the prohibitions of G.L.c. 221, §46[12] which provides in pertinent part as follows:
No corporation or association shall practice or appear as an attorney for any person other than itself ... or hold itself out to the public or advertise as being entitled to practice law, and no corporation or association shall draw agreements, or other legal documents not relating to its lawful business ... or give legal advice in matters not relating to its lawful business, or practice law, or hold itself out in any manner as being entitled to do any of the foregoing acts, by or through any person orally or by advertisement, letter or circular: provided, that nothing herein shall prohibit a corporation or association from employing an attorney in regard to its own affairs or in any litigation to which it is or may be a party or the insurer of a party . . .
Under this statute, title insurance companies such as First American would be entitled to issue policies based upon title examinations conducted by their own staff or by attorneys hired on their behalf. Colonial claims that it has resolved this issue in its role as issuing agent because Carroll now supervises its title work. Carroll, an attorney, may be hired as a title insurance agent directly by a title insurance company. A title insurance company, however, may not hire Colonial (who then hires Carroll) to conduct evaluations of title for purposes of issuing insurance.[13] Colonial is not a title insurance company incorporated pursuant to G.L.c. 175, §47, cl. 11; it is an agent of title insurance companies which may be so incorporated.

CONCLUSION

The activities of Colonial in its dual roles of title insurance issuing agent and closing agent as detailed above constitute the unlawful practice of law. Colonial is permanently enjoined from performing the following activities:
1. Evaluating title to real estate to determine the interest created, transferred or terminated and communicating that evaluation to any interested party to a residential real estate transaction.
2. Evaluating and ensuring that parties to a real estate transaction have complied with their agreements.
3. Preparing, drafting or reviewing legal documents that affect title to real estate or affect the obligation of the parties to the real estate transactions.
4. Explaining at the closing any documents relating to the interest in the real estate being created, transferred or terminated and relating to the agreement of the parties.
5. Issuing title certification or policy of title insurance premised on Colonial’s evaluation of title to real estate.
6. Holding itself out to lenders, title insurance companies or members of the public as willing and able to perform the functions enumerated in paragraphs 1-5 herein.
7. Representing lenders as their closing agents. Judgment shall enter accordingly. In light of judgment for the plaintiff, Colonial’s counterclaims and the third party complaint are dismissed.

 Unless otherwise noted, the activities of Colonial detailed herein relate to its activities prior to 1996.

 G.L.c. 221, §46B confers standing on the bar associations to bring an equitable action to restrain violations of G.L.c. 221, §§46, 46A and 46B.

 See e.g. Lowell Bar Ass’n, 215 Mass. at 180 (“The justification ... is to be found in the protection from the public from being advised and represented in legal matters by incompetent and unreliable persons, over whom the judicial department could exercise little control”); Statewide Grievance Comm. v. Patton, 683 A.2d 1359, 1361 (Conn. 1996), quoting Barton v. Los Angeles, 469 P.2d 353, 358 (Cal. 1970) (“The preparation of legal documents involves ‘difficult or doubtful legal questions . . . which, to safeguard the public, reasonably demand the application of a trained legal mind’ ’’); State v. Buyers Serv. Co., 357 S.E.2d 15, 19 (S.C. 1987) (“purpose is to protect the public from receiving improper legal advice"); Attorney Grievance Comm’n. v. Hallmon, 681 A.2d 510, 514 (Md. 1996) (stating that the purpose of the rule prohibiting attorneys from assisting unlicenced persons in-the practice of law “is to protect the public from being preyed upon by those not competent to practice law — from incompetent, unethical, or irresponsible representation”). The concern is based not only in the possibly inadequate legal training of real estate and title companies in providing settlement services but also the lack of accountability and potential conflict of interest in realizing their fees only if the deal closes.

 There are two separate opinions of the Single Justice of the Supreme Judicial Court that relate to the topic but arose in the context of bar disciplinary proceedings: In re Behenna, 92-72 BD (January 19, 1993, O’Connor, J.); In re Oates, 81-11BD (August 6, 1986, Liacos, J.).

 Colonial also places great emphasis on Dorr v. Massachusetts Ins. Co., 238 Mass. 490 (1921), in which the plaintiff sued the defendant title insurance company for negligently failing to timely inform the plaintiff that there was a right of way on his property. Although the defendant acted as a title insurer and as “plaintiffs paid agent in examining the title” the court was not confronted with a claim and an issue of the unauthorized practice of law. Id. at 495. Moreover, as a title examiner for the plaintiff, the defendant’s role was to search the title for encumbrances and inform the plaintiff of their existence. There is no suggestion in the case that the defendant was bound to give legal advice concerning any encumbrances. See Opinion of the Justices, 289 Mass. at 615.

 Although there is substantial overlap in Colonial’s roles and activities as issuing agent and closing agent, its role as title insurance agent presents some additional issues which are discussed below.

 In contrast to Colonial’s practice of including a form in the settlement package indicating that Colonial does not represent the buyer, seller or borrower, Mid-Atlantic included no such form. Colonial’s disclosure form, however, is not signed by the borrower until the closing when the borrower is signing between 35 and 50 documents.

 Accord, States v. Buyers, 357 S.E.2d 15, 18-19 (S.C. 1987); Bowers v. Transamerica Title Insurance Company, 675 P.2d 193, 197 (Wash. 1983); and Kentucky State Bar Association v. Tussey, 476 S.W. 177, 179 (Ky. 1972).

 G.L.c. 175, §47, cl. 11 provides that:
Companies may be incorporated . . . For the following purposes:
Eleventh, to examine titles of real and personal property, furnish information related thereto, and insure owners and others interested therein against loss by reasons of encumbrances, defective title or the insufficiency of any mortgage held or sold by the insured security for the amount secured by such mortgage, or against any other loss in connection with any such mortgage or any interest therein, and to buy and sell mortgages of property and interests therein.

 There is nothing inconsistent between G.L.c. 175, §47, cl. 11 and G.L.c. 221, §46 in the context of this case.

 Although there may well be ethical and criminal issues relating to Carroll’s post-1996 role at Colonial, those issues are not before the Court in this lawsuit. Similarly, whether a conflict exists when an attorney acts as lender's counsel and issuing agent is implicated by these facts but the issue is not before the Court.