[No. 11478-6-I.   Division One.   January 7, 1985.]

GALL LANDAU YOUNG CONSTRUCTION COMPANY, INC.,
*Respondent,* v. HURLEN CONSTRUCTION COMPANY,
*Appellant,* GREAT WESTERN UNION FEDERAL
SAVINGS AND LOAN ASSOCIATION,
ET AL, *Respondents.*

*Waitt, Johnson & Martens* and *Robert L. Frewing,* for appellant.

*Richard M. Stanislaw* and *Robert J. Burke,* for respondent Gall Landau Young Construction Company.

*George, Hull & Porter, P.S.,* by *T. Dennis George* and *Howard I. Hall,* for respondent Great Western Union Federal Savings and Loan Association.

*William B. Moore,* for respondent Knight.

*Neil H. Twelker,* pro se.

SCHOLFIELD, A.C.J.—Hurlen Construction Company (Hurlen), a subcontractor, appeals a judgment requiring it to indemnify Gall Landau Young Construction Company, Inc. (GLY), the general contractor, and Great Western Union Federal Savings and Loan Association (Great Western), the owner, for GLY's expenses in repairing two concrete "pads". Hurlen also appeals the award of attorney's fees and costs to GLY and Great Western. Great Western cross–appeals the dismissal of its claims against Pacific Testing Laboratories, Inc. (PTL) and Neil H. Twelker & Associates (Twelker). PTL and Twelker seek their attorney's fees on appeal as compensatory damages, contending that Great Western's cross appeal is frivolous.

In 1977, Great Western decided to build an office building and branch banking facility in the Bellefield Office Park in Bellevue, Washington. It retained a design team consisting primarily of Neil H. Twelker & Associates, a soils engi-

neering firm, Ralph D. Anderson & Partners/Booth & Koch, an architectural firm, and Ratti & Fossatti Associates, a structural engineering firm. The design team prepared a detailed set of plans, drawings and specifications for the project. Twelker prepared a soils report, describing the subsurface soil conditions that would be encountered during the construction. This report was needed to formulate design specifications and pile driving criteria because the construction site contained an upper strata of peat, irregular in depth, which was unsuitable by itself to support large structures.

In addition to the main office building and attached banking facility, the plans called for the construction of two concrete pads adjacent to the office building, one to support heating, ventilating and air conditioning (HVAC) equipment and the other to support a sewage vault. All three structures were to be supported by timber piles.

The piles supporting the office building were to be driven to "driving criteria" of "30 blows for the last 6 inches". This meant that a pile should be driven until, when struck 30 times, it penetrated 6 inches or less. The piles supporting the HVAC pad and sewage vault pad were to be driven to driving criteria of 15 blows for the last 6 inches. Twelker calculated these criteria.

In May 1979, Great Western and GLY entered into a general contract for construction of the office building and the related structures. This contract provided in part that Great Western would pay GLY the reasonable cost of any extra work performed in the absence of fault by GLY.

In June 1979, Hurlen signed a subcontract with GLY to furnish and drive the timber piles. This subcontract provided in part as follows:

4. BASIS AND SCOPE OF PAYMENT
Payment . . . shall be accepted by the Subcontractor as full compensation for furnishing all material and for doing all work contemplated and embraced in this agreement; for all loss and damage arising out of the nature of the work aforesaid, and for all risks of every description

connected with the said work.

. . .

14. Contractual Relationship

Subcontractor . . . agrees to indemnify, defend, save and hold Contractor and Owner harmless from any liability, claim, demand, cost or expense, including attorney's fees, arising out of any act performed, or representation made, by Subcontractor in the performance of any work hereunder.

. . .

17. Inspection and Correction

. . . In the event that any part of the work or any material is determined by Owner or Contractor to be improper or defective, either during the actual performance of work under the General Contract or during any guarantee period provided in the General Contract, . . . Subcontractor shall, immediately upon being notified in writing by Contractor to do so, proceed to remove, dispose and replace the same at its own cost and expense. . . . Subcontractor agrees to pay the Contractor all costs, expenses (including attorney's fees)[,] liabilities [and] consequential damages of Contractor in connection with said replacement or corrections, whether said replacements or corrections are removed, disposed of and replaced by Subcontractor or Contractor.

. . .

19. Liability for Injury and Damages

Subcontractor shall indemnify and defend and save harmless Owner and Contractor, and each of them, from and against any and all suits, actions, legal or administrative proceedings, claims debts, demands, damages, consequential damages, liabilities, interest, attorney's fees, costs and expenses or [sic] whatsoever kind or nature and whether they may arise before or after completion of Subcontractor's work under this Subcontract and which are in any manner directly or indirectly caused, occasioned or contributed to in whole or in part through any act, omission, fault or negligence whether active or passive, of Subcontractor or anyone acting und [sic] its direction, control, or on its behalf in connection with or incident to the work; . . .

Exhibit 3.

PTL contracted with Great Western to perform certain testing and inspection activities regarding the pile driving

operation. The contract provided that PTL would "perform all tasks and tests enumerated in Section 01400 of specifications". Section 01400–4–A specified the duties of the inspector in part as follows:

1. General:
Keep accurate records; make appropriate reports.
2. Authority of Inspectors:
Full authority to see that specifications are complied with. In the event unforeseen circumstances develop, inspector may stop work and make immediate report to Architect for decision.

Exhibit 2. Section 01400–4–B specified the responsibilities of the inspector in part as follows:

7. Piling:
Conduct tests for bearing capacity of piling; determine bearing strata. Check placement for location and length of piling. Provide continuous inspection of piles and driving. Keep continuous record of all driving operations.

Exhibit 2.

Hurlen began driving the piles for the project on June 4, 1979. On June 19, 1979, Hurlen drove the piles for the HVAC and sewage vault pads. This driving was overseen by a PTL inspector named Brueggeman, who had replaced the original PTL inspector on June 15, 1979. The piles were driven to criteria of 15 blows for the last 6 inches. Piles for the HVAC pad were driven to depths ranging between 34 and 38 feet and piles for the sewage vault pad were driven to depths ranging between 32 and 34 feet. No one observed, and Brueggeman did not record, any difficulty with the pile driving operation that day. Nothing indicated that the piles had been driven to inadequate depths or to criteria other than in strict compliance with the specifications provided by Great Western.

After Hurlen finished driving the piles for the project, GLY built the two pads in accordance with the contract specifications. Several months later, however, both pads settled. The parties were unable to agree upon responsibility.

Great Western's design team prepared a new set of plans,

which required that replacement piles be driven to solve the settlement problem. The replacement piles were to be larger in tip diameter than the original piles and were to be driven to double the driving criteria: 30 blows for the last 6 inches. Hurlen drove the replacement piles to these criteria. The replacement piles for the HVAC pad were driven to depths ranging from 47 to 53 feet and the replacement piles for the sewage vault pad were driven to depths ranging from 31 to 40 feet. The replacement piles corrected the settlement problem. GLY then repaired the pads.

GLY filed suit against Hurlen to recover the costs of repairing the pads. Hurlen counterclaimed against GLY and filed a third party complaint against Great Western to recover the costs of driving the replacement piles.[1] Great Western counterclaimed against Hurlen, cross-claimed against GLY and filed a third party complaint against PTL, Twelker, Ralph Anderson & Partners/Booth & Koch and Ratti & Fossatti Associates. Great Western later stipulated to an order dismissing with prejudice its claims against the latter two parties. At trial, Great Western contended that PTL had contracted to perform professional engineering services and that PTL's negligent performance of those services proximately caused the sinking of the pads. Great Western also contended that Twelker had contracted to insure that project personnel were instructed in the proper techniques and that Twelker's breach of this contract was a proximate cause of the sinking. Twelker counterclaimed against Great Western.

The trial court found that none of the parties were negligent. The trial court also found, however, that GLY's costs in repairing the pads "resulted from acts on the part of Hurlen in connection with pile driving activity." Finding of fact 39, in part. Relying on sections 14 and 19 of the subcontract, the trial court found Hurlen obligated to indemnify GLY for those costs. Relying on section 17 of the

---

[1]Hurlen's third party complaint also named Mortgage Trust of America; however, Hurlen later stipulated to an order dismissing this claim without prejudice.

subcontract, the trial court found Hurlen obligated to pay GLY's costs, separate and apart from the indemnity provisions. The court also found that Great Western was a third party beneficiary of the indemnity provisions in the subcontract. The court also concluded that because GLY's costs in repairing the pads were for work performed in the absence of fault by GLY, the costs were for "extra work" under the Great Western/GLY prime contract and therefore were recoverable by GLY from Great Western. Claims against PTL were dismissed and Great Western's claim against Twelker was dismissed at the conclusion of Great Western's case.

The trial court entered judgment as follows:

1. GLY was awarded judgment against Great Western and Hurlen, jointly and severally, for GLY's costs in repairing the HVAC and sewer vault pads in the amount of $42,348.72, plus interest, and for GLY's attorney's fees and costs in the amount of $22,431.25.

2. GLY's lien on the Great Western property was ordered foreclosed and GLY was authorized to proceed to sale if that lien was not satisfied.

3. Hurlen was granted judgment against Great Western for Hurlen's costs in driving replacement piles in the amount of $20,780.96, plus interest, and for Hurlen's attorney's fees and costs in the amount of $2,566.75. Also, Hurlen's lien on the Great Western property was ordered foreclosed.

4. Great Western was granted judgment against Hurlen in the amount for which Great Western was liable to GLY and in the additional amount for which Great Western was liable to Hurlen. Hurlen's lien on the real property of Great Western was deemed satisfied and Hurlen's judgment against Great Western was deemed set off by Great Western's judgment against Hurlen. Great Western also recovered judgment against Hurlen in the amount of $27,612.50 for attorney's fees and costs.

5. The claims of Hurlen and Great Western against GLY were dismissed with prejudice.

6. The claims of Hurlen and Great Western against PTL were dismissed with prejudice and the claim of PTL against Great Western for attorney's fees was dismissed with prejudice.

7. The claims of Great Western against Twelker and Twelker against Great Western were dismissed with prejudice.

We hold that the judgments awarded GLY and Great Western against Hurlen are erroneous and reverse. In all other aspects of the judgment, the trial court is affirmed.

## INDEMNITY

Six months after the entry of judgment in this case on February 26, 1982, the Supreme Court decided *Brame v. St. Regis Paper Co.*, 97 Wn.2d 748, 649 P.2d 836 (1982), where the general contractor sought indemnity from a subcontractor based on an indemnity agreement reading as follows:

> To indemnify and save harmless the CONTRACTOR [Baugh] from and against any and all suits, claims, actions, losses, costs, penalties, and damages, of whatsoever kind or nature, including attorney's fees, arising out of, in connection with, or incident to the SUBCONTRACTOR'S [General Mechanical's] performance of this SUBCONTRACT.

*Brame,* at 750–51.

In resisting the subcontractor's motion for summary judgment, the general contractor (indemnitee) failed to produce evidence that the loss was "caused by or contributed to by the negligence of the indemnitor". *Brame,* at 750. A similar issue was before the court in *Jones v. Strom Constr. Co.,* 84 Wn.2d 518, 527 P.2d 1115 (1974). In *Brame,* the court described the effect of *Jones* as limiting the scope of such indemnification agreements to those cases in which some activity of the employer contributed to the injury. In *Jones,* the court stated at pages 521–22:

> It makes no mention of or reference to Strom's "performance" of the primary contract. It is, therefore, Belden's performance of the subcontract, and losses

"arising" from, connected with, or incidental to that performance, which forms the keystone on which indemnity turns. Thus, it is clear that unless an overt act or omission on the part of Belden in its performance of the subcontract in some way caused or concurred in causing the loss involved, indemnification would not arise. Belden's mere presence on the jobsite inculpably performing its specified contractual obligations, standing alone, would not constitute a cause or participating cause.

Reviewing the indemnity language before us in light of the *Jones* reasoning, we find that paragraph 14 requires an "act performed" in performance of the contract. Paragraph 17 requires "improper or defective" work by Hurlen. Paragraph 19 requires an "act, omission, fault or negligence" of Hurlen. This language cannot be distinguished from the indemnity language relied upon by the court in *Jones.*

Great Western in its brief makes no claim of fault or even an overt act on the part of Hurlen in the performance of its pile driving duties other than to say that Hurlen drove the piles. At page 27 of its brief, Great Western asserts:

[T]he structures sank because the original piles did not support them. Accordingly, Hurlen's "act" that triggers indemnity is the act of driving the piles.

This argument does not meet the requirement of *Jones* and *Brame* that something more is necessary to trigger a duty to indemnify than the subcontractor's "mere presence on the jobsite inculpably performing its specified contractual obligations". *Jones,* at 522.

Driving the piling in accordance with the specifications and without fault of any kind was not found by the trial court to be the cause of the settlement. This fact alone distinguishes this case from *Continental Cas. Co. v. Metropolitan Seattle,* 66 Wn.2d 831, 405 P.2d 581 (1965), a case relied upon by GLY, Great Western and the trial judge.

In *Continental,* the general contractor, General Construction (General), was held obligated to indemnify the Municipality of Metropolitan Seattle (Metro) for claims against Metro brought by third parties whose nearby prop-

erties had been damaged by "dewatering and pile driving activities of General Construction which resulted in vibration and loss of subjacent support." *Continental,* at 832–33.

*Continental* is clearly distinguishable from this case because it did not involve the issue of the obligation of a contractor to indemnify when it inculpably performed its contract duties. The contract in *Continental* placed duties on General that were breached.

> The contractor was permitted to use any method of excavation which would not damage or endanger adjacent structures or property. The contract directed the contractor to dewater the excavations so as not to cause injury to public or private property, and to operate the dewatering system so that the ground–water level outside the excavation be "not reduced to the extent that would damage or endanger adjacent structures or property."
>
> The foregoing contractual requirements, combined with the indemnity provision, clearly negate the contention that General Construction agreed only to refrain from negligently damaging adjacent property.

*Continental Cas. Co. v. Metropolitan Seattle, supra* at 836.

Thus, although General may have not been negligent, it certainly was not in the status that Hurlen enjoys here, that is, a contractor that inculpably performed all duties imposed upon it by the contract.

Finally, paragraph 17 of the subcontract does not support a finding of liability against Hurlen because the trial court did not find that Hurlen's work was "improper or defective". Paragraphs 4, 14 and 19 do not support imposing upon Hurlen an obligation to indemnify because the facts in this case do not meet the requirement of *Jones* and *Brame* of activity, other than inculpable performance, which causes or contributes to the loss.

#### DISMISSAL OF PTL

The trial court found that PTL functioned on the project as an inspection service and testing laboratory rather than as an engineering firm. The court also found that PTL nonnegligently performed its inspection and testing activities. Great Western contends that PTL functioned as a

professional engineering firm and that its performance did not meet the corresponding higher standard of care. It argues that the contract between Great Western and PTL gave PTL "[f]ull authority to see that specifications are complied with", which constitutes the practice of engineering under RCW 18.43.020.[2] It argues that the contract referred to "professional services" and that PTL represented itself as an engineering firm in documents submitted to Great Western. Great Western contends that this issue is a question of law, not fact.

We do not agree that this issue is a question of law or that PTL functioned as an engineering firm. The contract between Great Western and PTL was ambiguous. Although it mentioned professional services and compliance with specifications, it required PTL to perform only testing and inspection services. Also, the amount paid to PTL under the contract was commensurate with inspection and testing rather than engineering and Great Western had already retained a design team, which had prepared pile driving specifications. Finally, Great Western also raised the factual issue of PTL's alleged representations outside the contract. We hold that the capacity in which PTL functioned on the project was a question of fact and that the trial court's finding is supported by substantial evidence. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 343 P.2d 183 (1959).

Great Western also contends that even if PTL performed only inspection and testing services, it was negligent regarding the piles driven for the sewage vault pad. Again,

---

[2]RCW 18.43.020 provides, in part:

"Practice of engineering: The term 'practice of engineering' within the meaning and intent of this chapter shall mean any professional service or creative work requiring engineering education, training, and experience and the application of special knowledge of the mathematical, physical, and engineering sciences to such professional services or creative work as consultation, investigation, evaluation, planning, design and supervision of construction for the purpose of assuring compliance with specifications and design, in connection with any public or private utilities, structures, buildings, machines, equipment, processes, works, or projects."

this is a factual dispute resolved by the trial court on substantial evidence. *Thorndike v. Hesperian Orchards, Inc.*, *supra*. The trial court did not err in dismissing PTL.

### DISMISSAL OF TWELKER

The trial court granted Twelker's motion to dismiss made at the close of Great Western's case in chief. Great Western contends that the trial court erred because Great Western produced evidence that Twelker had failed to provide supervision on the project in accordance with a commitment to do so made in a letter to Great Western.

■ The standard of review of a motion to dismiss for insufficiency of the evidence was recently set forth in *Phennah v. Whalen*, 28 Wn. App. 19, 22, 621 P.2d 1304 (1980), *review denied*, 95 Wn.2d 1026 (1981):

> In ruling on a motion to dismiss for insufficiency of evidence either the trial court or the appellate court must accept as true the nonmoving party's evidence and draw all favorable inferences that may reasonably be evinced. RCW 4.56.150; *Rosendahl v. Lesourd Methodist Church*, 68 Wn.2d 180, 412 P.2d 109 (1966); *Moyer v. Clark*, 75 Wn.2d 800, 454 P.2d 374 (1969). The motion may be granted only if it can properly be said as a matter of law that there is no evidence or reasonable inference therefrom to sustain a verdict for the nonmoving party. *Miller v. Payless Drug Stores of Wash., Inc.*, 61 Wn.2d 651, 379 P.2d 932 (1963).

Although Great Western presented evidence that Twelker did not visit the jobsite as often as requested, it offered *no proof* that, had Twelker visited the jobsite *more often*, the problems giving rise to this lawsuit would thereby have been avoided. Great Western had the burden of producing evidence from which the trial court could find that Twelker's alleged failures to visit the jobsite were a proximate cause of the settling of the HVAC and sewage vault pads. There being no evidence from which the trial court could find causation, its dismissal of Twelker with prejudice was not erroneous.

### Frivolous Appeal

PTL and Twelker cross–appeal for an award of attorney's fees on appeal against Great Western as a sanction on the ground that Great Western's appeal in both cases is frivolous. RAP 18.9(a) provides, in part:

> The appellate court on its own initiative or on motion of a party may order a party or counsel who uses these rules for the purpose of delay or who fails to comply with these rules to pay terms or compensatory damages to any other party who has been harmed by the delay or the failure to comply.

In deciding this issue, we rely upon the guidelines stated in *Streater v. White,* 26 Wn. App. 430, 613 P.2d 187 (1980), at pages 434–35:

> In determining whether an appeal is brought for delay under this rule, our primary inquiry is whether, when considering the record as a whole, the appeal is frivolous, *i.e.,* whether it presents no debatable issues and is so devoid of merit that there is no reasonable possibility of reversal. *See* Black's Law Dictionary 796 (rev. 4th ed. 1968); *Means v. Sears, Roebuck & Co.,* 550 S.W.2d 780 (Mo. 1977); *United States v. Piper,* 227 F. Supp. 735 (N.D. Tex. 1964).
>
> In determining whether an appeal is frivolous and was, therefore, brought for the purpose of delay, justifying the imposition of terms and compensatory damages, we are guided by the following considerations: (1) A civil appellant has a right to appeal under RAP 2.2; (2) all doubts as to whether the appeal is frivolous should be resolved in favor of the appellant; (3) the record should be considered as a whole; (4) an appeal that is affirmed simply because the arguments are rejected is not frivolous; (5) an appeal is frivolous if there are no debatable issues upon which reasonable minds might differ, and it is so totally devoid of merit that there was no reasonable possibility of reversal. *See* Jordan, *Imposition of Terms and Compensatory Damages in Frivolous Appeals,* Wash. St. B. News, May 1980, at 46.

Great Western's contentions in appealing the dismissals of PTL and Twelker are not totally devoid of merit. The appeals raised debatable issues and were not frivolous. The

claims of PTL and Twelker are denied.

CONCLUSION

1. The judgment awarding damages to GLY against Hurlen in the amount of $42,348.72, plus interest, and attorney's fees and costs in the amount of $22,431.25 is reversed.

2. Great Western's judgment against Hurlen in the amount for which Great Western was held liable to GLY and for the additional amount for which Great Western was held liable to Hurlen and awarding $27,612.50 in attorney's fees and costs in favor of Great Western against Hurlen is reversed.

3. Hurlen's judgment awarding damages against Great Western in the amount of $20,780.96, plus interest, and attorney's fees and costs in the amount of $2,566.75 is affirmed.

4. Foreclosure of Hurlen's lien against Great Western is affirmed.

5. Dismissals with prejudice of Twelker and PTL are affirmed.

6. Claims of Twelker and PTL against Great Western for attorney's fees as sanctions on appeal are denied.

7. The superior court judgment in all other respects is affirmed.

SWANSON and RINGOLD, JJ., concur.

Reconsideration denied February 11, 1985.

Review denied by Supreme Court March 15, 1985.