[No. 27548-8-I. Division One. January 21, 1992.]

SCOTT GALVANIZING, INC., *Respondent*, v. NORTHWEST ENVIROSERVICES, INC., *Appellant*.

*David S. Grossman, Lawrence E. Hard,* and *LeSourd & Patten, P.S.,* for appellant.

*Theodore H. Millan, James M. Beecher,* and *Hackett, Beecher & Hart,* for respondent.

WEBSTER, A.C.J. — Northwest EnviroServices (NWES) appeals, asserting that the trial court erred in granting summary judgment based on its conclusion that NWES was contractually obligated to indemnify Scott Galvanizing, Inc., for liabilities imposed under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA).[1] NWES also contends that the trial court erred in determining the amount of reasonable attorney fees awarded to Scott pursuant to the indemnity agreement.

## FACTS

Scott Galvanizing coats steel with zinc using a "hot dip" process. A byproduct of the hot dip process is a waste known as "spent pickle liquor", which consists of sulfuric acid and other chemicals. Prior to 1979, Scott disposed of its industrial waste in the Metro sewer system. Thereafter, Scott contracted with a liquid waste disposal company (LIDCO) to transport its waste to the Western Processing, Inc., hazardous waste disposal facility in Kent, Washington. From 1979 to 1982 Scott Galvanizing sent at least 78,900 gallons of spent pickle liquor to the Western Processing site via LIDCO.

In 1982 LIDCO raised its prices and Scott Galvanizing approached NWES (formerly Northwest Tank Services) to discuss the possibility of NWES transporting Scott's industrial waste. Larry Peterson of NWES and Lee Russell of Scott Galvanizing discussed the terms under which NWES would transport Scott's waste. Russell informed Peterson that Scott Galvanizing wanted to continue to dispose its waste at the Western Processing site because the Western Processing operators charged the lowest prices.

In 1982, Scott Galvanizing and NWES entered into a written contract entitled "Hazardous Waste Agreement", which was prepared by NWES. The agreement recited that NWES would transport Scott's industrial waste to a disposal site and to an approved chemical processor. The agreement provided in pertinent part:

---

[1] 42 U.S.C. § 9607(a) *et seq.*

    f. [NWES] agrees to indemnify and hold [Scott Galvanizing] harmless from any and all liability, damages, costs, claims, demands and expenses (including reasonable attorney fees), including but not limited to pollution or other damages, as and to the extent that such liability, damages, costs, claims, demands and expenses are caused by, arise out of or in any manner result from the performance by [NWES] of its services under this agreement or arise out of the negligence of [NWES] provided, however, that the loss or claim does not result from the misidentification or failure to properly identify the materials by [Scott Galvanizing] or the negligence of [Scott Galvanizing].

The agreement also provided that title to Scott Galvanizing's waste materials would pass to NWES once the materials were loaded onto NWES's vehicles and the shipping papers were executed. In addition, the agreement obligated NWES to comply with present and future state and federal pollution laws, and gave NWES the right to terminate the hazardous waste agreement because of changes in pollution laws or regulations. Moreover, NWES was obligated to carry significant amounts of insurance and provide proof of insurance upon Scott's request.

Both parties contend that they were unaware of the potential strict liability of hazardous waste generators and transporters under CERCLA at the time that they entered into the contract. Scott Galvanizing asserts that Peterson must have known of CERCLA since he was the environmental manager at Northwest Tank in 1982 and was responsible for effecting compliance with environmental regulations. Peterson admitted to telling Russell that once Scott Galvanizing's spent pickle liquor was on the NWES truck and the paperwork finished that the material became NWES's responsibility.

Shortly after NWES began transporting Scott Galvanizing's waste, NWES learned that a governmental agency had begun questioning the adequacy of Western Processing's disposal methods. Peterson contacted Russell and suggested that Scott Galvanizing allow NWES to dispose of Scott's industrial waste at a disposal site other than the Western Processing site. Russell insisted that NWES con-

tinue to transport Scott's industrial waste to the Western Processing site because it was the cheapest and was legal to use. In April of 1983, the United States Environmental Protection Agency (EPA) designated the Western Processing site a "super fund" cleanup site under CERCLA and ordered the facility to cease operations. Scott Galvanizing disposed of a total of 130,600 gallons of spent pickle liquor at the Western Processing site. Of this amount, NWES transported approximately 51,700 gallons, or 39.6 percent of the total volume.

The United States and the State of Washington brought an action in the United States District Court seeking to recover the costs of cleaning up the Western Processing disposal site. Western Processing and over 300 entities, who had generated or transported waste, including Scott Galvanizing, were designated as "potentially responsible parties" (PRP's). Cleanup of the Western Processing site was divided into two phases. In 1984 the United States and the State of Washington entered into a consent decree with certain PRP's in settlement of the Phase I cleanup. The settling PRP's brought a third party contribution action against Scott Galvanizing and other nonsettling entities. Scott Galvanizing settled the contribution action by paying $50,000. A Phase II contribution action against nonsettling parties, including Scott Galvanizing, has been initiated and is currently pending before the United States District Court. In addition, Standard Equipment, Inc., whose property adjoined the Western Processing facility, brought suit against Scott and other generators of hazardous waste that had been disposed of at the Western Processing site. Scott Galvanizing settled Standard's claims for $50,000.

When Scott Galvanizing learned of its potential liability as a PRP, it retained its regular corporate attorney, Richard Sessions, to defend it. In 1985, Sessions formally tendered the defense of the Western Processing action to Scott's insurance carriers, who accepted the tender under a reser-

vation of rights. Sessions continued to represent Scott Galvanizing after the Western Processing claims had been tendered to Scott's insurers. Between April of 1985 and May of 1986, Sessions performed legal work on behalf of Scott for which he was paid $26,075.84. In February of 1986, Scott Galvanizing's insurance carriers retained the law firm of Hackett, Beecher & Hart (HBH) to represent Scott in the Western Processing litigation. Between February 1986 and October 5, 1990, Scott Galvanizing incurred $77,661.25 in attorney fees payable to HBH. Scott continued to retain the representation of Sessions even after its insurer hired HBH. Between December of 1986 and September 30, 1990, Scott incurred attorney fees payable to Sessions in the amount of $18,280.

Scott Galvanizing filed suit against NWES to recover amounts expended in settling the Western Processing Phase I settlement and the Standard Equipment suit, as well as attorney fees and costs incurred in defending against the Western Processing litigation. On August 15, 1990, Scott Galvanizing filed a motion for summary judgment to establish NWES's liability under the indemnity agreement. The trial court granted the motion, holding that NWES was obligated to indemnify Scott for 39.6 percent of Scott's total liability for the settlement amounts and costs. The judgment also applied to all future liability, damages, costs, claims, demands, and expenses arising out of or resulting from the delivery of Scott's spent pickle liquor to Western Processing. After a trial to determine the amount of NWES's liability to Scott, the trial court awarded Scott Galvanizing 39.6 percent of: (1) the attorney fees charged by Richard Sessions and the HBH firm in the respective amounts of $33,266.88 and $77,661.25; (2) costs of $29,919.58; (3) $50,000 incurred with respect to the Phase I contribution action; and (4) $50,000 with respect to the Standard Equipment settlement.

## DISCUSSION

NWES contends that it has no duty to indemnify Scott Galvanizing, because there was no overt act or omission on its part which caused or contributed to the liability imposed under CERCLA, and that the parties intended Scott to assume responsibility for liabilities not caused or contributed to by NWES in performing its contractual duties. Scott contends that the parties intended NWES to bear the risk of any loss or liability not attributable to Scott's improper identification or negligence.

A party determined to be liable for response costs under CERCLA may seek contribution or indemnification under federal or state law, including common law, from a party who is not a potentially responsible party (PRP) under section 107(a) of CERCLA.[2] *United States v. Hooker Chems. & Plastics Corp.*, 739 F. Supp. 125, 127-29 (W.D.N.Y. 1990); 42 U.S.C. § 9607(e)(1). Therefore, the fact that NWES was not named as PRP in the CERCLA litigation involving the Western Processing site has no bearing on Scott Galvanizing's indemnification claim against NWES, which arose out of the contract between them. *See United States v. Hooker Chems. & Plastics Corp., supra* at 127-29; 42 U.S.C. § 9607(e)(1).

Contracts of indemnity are subject to the same rules of construction governing other contracts. *Jones v. Strom Constr. Co.*, 84 Wn.2d 518, 520, 527 P.2d 1115 (1974). The intent of the parties controls and the intent must be determined from a reading of the contract as a whole. *Jones*, at 520. Under the "context rule" recently adopted by the Supreme Court, extrinsic evidence is admissible for the purpose of determining the intended meaning of what is written. *Berg v. Hudesman*, 115 Wn.2d 657, 667, 669, 801 P.2d

---

[2]Section 107(a) of CERCLA establishes four classes of persons liable for response costs. 42 U.S.C. §§ 9601(23)-(25), 9607(a)(4)(A)-(B). *See United States v. Hooker Chems. & Plastics Corp.*, 739 F. Supp. 125, 127 (W.D.N.Y. 1990).

Although a PRP may not shield itself from liability on the basis of insurance or indemnity agreements with third parties, liability under CERCLA does not affect "any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under [CERCLA]." 42 U.S.C. § 9607(e)(1).

222 (1990). Types of extrinsic evidence include: (1) the subject matter and objective of the contract, (2) the circumstances surrounding the making of the contract, (3) the subsequent conduct of the parties to the contract, (4) the reasonableness of the parties' respective interpretations, (5) statements made by the parties in preliminary negotiations, (6) usages of trade, and (7) the course of dealing between the parties. *Berg*, at 666-68.

In addition to these general rules, Washington courts have enunciated principles governing the construction and interpretation of indemnity provisions. Clauses purporting to exculpate an indemnitee for liabilities flowing from the indemnitee's acts or omissions are not favored and any doubts are settled in favor of the indemnitor. *Jones*, at 520. However, courts should view indemnity clauses "realistically, recognizing the intent of the parties to allocate . . . between them the cost or expense of the risk of losses or damages arising out of performance of the contract". *Jones*, at 521. With respect to construction contracts, causation rather than negligence is the "touchstone of liability . . ., although negligence may be incidental to the cause." *Jones*, at 521.

In three cases involving construction contracts, Washington courts have held that an indemnity clause obligating the indemnitor to hold another harmless for damages "arising out of, in connection with, or incident to" the indemnitor's performance of a contract does not require the indemnitor to indemnify, unless an act or omission relating to the indemnitor's performance caused or contributed to the damages. *Jones*, at 521-22; *Brame v. St. Regis Paper Co.*, 97 Wn.2d 748, 751, 649 P.2d 836 (1982), *modified on other grounds in Brown v. Prime Constr. Co.*, 102 Wn.2d 235, 684 P.2d 73 (1984); *Gall Landau Young Constr. Co. v. Hurlen Constr. Co.*, 39 Wn. App. 420, 428, 693 P.2d 207, *review denied*, 103 Wn.2d 1026 (1985). Stating this rule in other terms, something more than the indemnitor's inculpable performance of its contractual duties is necessary to trigger a duty to indemnify. *Gall Landau Young*, at 428.

In *Jones*, the court found the subcontractor had no duty to indemnify the general contractor because the subcontractor's employee's injuries resulted from the negligence of the general contractor. *Jones*, at 522. In *Gall Landau Young*, the court held that the subcontractor had no duty to indemnify the general contractor when the subcontractor drove piles to the depth specified by contract, but the depth later proved insufficient to support the building.[3] *Gall Landau Young*, at 425. Thus, on their facts, both *Jones* and *Gall Landau Young* stand for the proposition that a subcontractor/indemnitor has no responsibility to indemnify the general contractor/indemnitee for liabilities arising in the course of the subcontractor's performance of its contract, when those liabilities stem from the fault of, or can at least be causally attributed to, the general contractor.

In the instant case, the liability imposed under CERCLA was not caused or contributed to by any act or omission of NWES beyond the performance of its contractual duties. Unlike in *Jones* and *Gall Landau Young*, however, the CERCLA liability imposed did not stem from the fault of Scott Galvanizing and cannot be causally attributed to it. Furthermore, despite the inclusion of language essentially the same as the language "arising out of, in connection with, or incident to", which was construed in *Jones*, *Brame*, and *Gall Landau Young*,[4] the contract between NWES and Scott also contains the following additional language:

> provided, however, that the loss or claim does not result from the misidentification or failure to properly identify the materials by [Scott Galvanizing] or the negligence of [Scott Galvanizing].

With the addition of this language, the indemnity provision could be construed as meaning that the parties intended

---

[3]The *Brame* case rested on the general contractor's failure to allege that the liability was caused or contributed to by any act or omission of the subcontractor. *See Brame*, 97 Wn.2d at 751.

[4]The contract stated that NWES was obligated to indemnify Scott for liabilities that "in any manner result from the performance by [NWES] of its services under this agreement".

that Scott Galvanizing would assume responsibility only for liabilities caused by its negligence or improper identification of materials, and that NWES would assume responsibility for all other liabilities.

Other provisions found in the agreement between NWES and Scott Galvanizing suggest that the parties intended for NWES to assume responsibility for risks associated with the pickle liquor once it passed to NWES's tanks. The agreement provided that title to the hazardous waste passed to NWES once it was loaded onto NWES vehicles and the shipping documents had been completed. It also required NWES to maintain and provide proof of general comprehensive and automobile liability insurance with minimum limits of $1 million. The agreement further obligated NWES to comply with applicable state and federal laws, rules, and regulations, including "those relating to air, water and land pollution", and to comply with any future regulations. Upon request, NWES was obligated to verify its compliance.

The extrinsic evidence also supports the interpretation that the parties intended for NWES to assume responsibility for risks associated with the pickle liquor once it passed to NWES's tanks. *See Berg,* at 667-69. Larry Peterson admitted telling Lee Russell that once the material passed to NWES trucks and the paperwork was completed, the material became NWES's "responsibility". We reject NWES's contention that a reasonable juror could conclude based on the extrinsic evidence that the parties did not intend NWES to assume responsibility for the risks associated with the pickle liquor once it left Scott Galvanizing's plant. *See Berg,* at 668.

NWES contends that Scott Galvanizing's "insistence" that NWES continue to transport the waste to Western Processing after its disposal methods had been called into question renders Scott liable. We reject this argument. Disposal at the Western Processing site was a term that Scott Galvanizing bargained for because it was the cheapest disposal facility. NWES had the power to terminate its contract with

Scott upon 30 days' written notice. If NWES no longer wanted responsibility for the risks associated with disposal of Scott's waste at the Western Processing facility, NWES could have terminated the contract.

We conclude that the contract between Scott and NWES, viewed as a whole taking into account the extrinsic evidence, does not support NWES's argument that it is not liable to Scott unless it caused or contributed to the liability imposed under CERCLA by some act or omission apart from the performance of its contractual duties, when the liability incurred is no more logically attributable to Scott Galvanizing than it is to NWES. The trial court did not err in concluding as a matter of law that the parties intended for NWES to assume responsibility for any risks related to the waste disposal that did not result either from Scott's negligence or its improper identification of materials.

NWES next contends that the trial court erred in granting summary judgment when genuine issues of material fact existed regarding Scott Galvanizing's liability under CERCLA. Since we have determined as a matter of law that NWES's obligation to indemnify Scott does not rest on a finding that some action apart from NWES's contractual duties caused a release or threatened release of hazardous substances, we reject NWES's argument that the existence of genuine issues of material fact on this point precludes summary judgment.

NWES argues nonetheless for the first time in its reply brief that Scott's liability under CERCLA is not supported by the evidence. NWES does not deny that the spent pickle liquor is a hazardous substance, or that it transported approximately 51,700 gallons of Scott Galvanizing's spent pickle liquor to the Western Processing facility. However, NWES argues that Scott Galvanizing presented no evidence that there was a "release, or threatened release" of a hazardous substance from the gallons transported by NWES "which cause[d] the incurrence of response costs". 42 U.S.C. § 9607(a)(4). Since the pickle liquor was a hazardous substance and Western Processing's disposal had already led to contamination and presumably posed a significant

risk of further contamination, we can infer that there was, at minimum, a "threatened release" from the hazardous waste that NWES transported to Western Processing. NWES conceded in its brief that some portion of the total amount of Scott's waste was released or that there was a threat of such release. Moreover, NWES has stipulated to the reasonableness of Scott's settlement of its liabilities under CERCLA. We conclude that the indemnity judgment in favor of Scott for liability arising under CERCLA is supported by the evidence.

Lastly, we address whether the trial court abused its discretion in holding that attorney fees charged by Scott Galvanizing's counsel, reduced by 25 percent, were reasonable. NWES contends that attorney fees awarded Richard Sessions, Scott's in-house counsel, were duplicative and excessive. In particular, NWES contends that the trial court erred in including hours spent by Richard Sessions on the case after Sessions formally tendered the defense to Scott's insurance carriers.

■■ The trial court's award of attorney fees is reviewed for an abuse of discretion. *Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 65, 738 P.2d 665 (1987). The trial court has not abused its discretion unless no reasonable person would take the position it adopted. *Allard v. First Interstate Bank*, 112 Wn.2d 145, 148, 768 P.2d 998, 773 P.2d 420 (1989). Attorney fees are determined by calculating the "lodestar", or the number of hours worked times a reasonable hourly rate. *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 675 P.2d 193 (1983). In calculating the lodestar, the court must discount "hours spent on unsuccessful claims, duplicated effort, or otherwise unproductive time." *Bowers*, at 597; *accord, Nordstrom, Inc. v. Tampourlos*, 107 Wn.2d 735, 744, 733 P.2d 208 (1987). Courts generally use the attorney's customary hourly rate but may adjust for factors such as "the level of skill required by the litigation, time limitations imposed on the litigation, the amount of the potential recovery, the attorney's reputation, and the undesirability of the case." *Bowers*, at 597. In the instant case, the trial court held:

23. The relatively small size of the settlements does not begin to reflect the enormous risk and potential exposure faced by Scott in these actions. Response cost liability under CERCLA is essentially boundless, both in amount and duration. . . . For a small company such as Scott with limited insurance coverage, the risks and potential exposure are even greater than for a larger company.

24. Unresolved questions regarding insurance coverage and the viability of defenses asserted by Scott's insurance carriers also increased Scott's potential exposure. These questions were not fully resolved until the Washington Supreme Court decided the case of *Boeing [Co.] v. Aetna Casualty and Surety Co.*, 113 Wn.2d 869, [784 P.2d 507 (1990)]. In short, the potentially unlimited exposure under CERCLA coupled with the unresolved state of the law at the time presented Scott with an unusual situation, far different from the normal "excess coverage" case.

25. In light of these circumstances, it was not unusual for Scott to continue to rely on its own corporate counsel to monitor the litigation and to assist as necessary in the defense of the cases. Even though Mr. Sessions was not specialized in this area of law, it was reasonable and necessary for him to become knowledgeable and to remain involved. His involvement was not unreasonable nor totally duplicative of the work being done by HBH. However, in light of the fact that the bulk of the work representing Scott in this litigation was being done by the attorneys at HBH, the court feels that Mr. Sessions' fees and costs should be reduced by 25% to an amount which the court finds to be reasonable and necessary.

The court's award of fees to Sessions after Scott Galvanizing tendered the defense rests on the court's conclusion that Sessions' work was necessary in view of the enormous risk facing Scott and the unresolved state of the law. NWES asserts that hours Sessions spent reviewing the volumes of pleadings and attending the depositions of his client's representatives were duplicative. The court found, however, that Sessions' representation was "not totally duplicative", and reduced his costs by 25 percent in order to account for any duplication. NWES also asserts that Sessions' fees were excessive, but fails to indicate what hourly rate was charged or why it was excessive. The fact that Sessions had no expertise in environmental litigation cleanup does not

necessarily mean that he should not be entitled to his regular hourly rate. NWES has failed to demonstrate that the trial court abused its discretion.

The judgment is affirmed.

FORREST, J., concurs.

SCHOLFIELD, J. (dissenting) — Being convinced that the enforcement of the indemnity provision involved in this case is contrary to the holding in *Jones v. Strom Constr. Co.*, 84 Wn.2d 518, 527 P.2d 1115 (1974), *Brame v. St. Regis Paper Co.*, 97 Wn.2d 748, 649 P.2d 836 (1982), and *Gall Landau Young Constr. Co. v. Hurlen Constr. Co.*, 39 Wn. App. 420, 693 P.2d 207, *review denied*, 103 Wn.2d 1026 (1985), I respectfully dissent.

The principle applied in *Jones*, *Brame*, and *Gall* is that liability cannot be imposed pursuant to an indemnity agreement in the absence of a showing of an act or omission by the indemnitor arising out of its performance of the contract which causes or contributes to the loss to be indemnified.

The application of this rule of law to the facts of this case is demonstrated in the majority opinion at 810, acknowledging as follows:

> In the instant case, the liability imposed under CERCLA was not caused or contributed to by any act or omission of NWES beyond the performance of its contractual duties.

The majority opinion at 812 then attempts to distinguish this case from *Jones*, *Brame*, and *Gall* on the basis that the parties intended

> for NWES to assume responsibility for any risks related to the waste disposal that did not result either from Scott's negligence or its improper identification of materials.

In so concluding, the majority opinion relies upon language in the indemnity agreement signed by NWES, which is described as an exception to the otherwise broad indemnity language and reads as follows:

> provided, however, that the loss or claim does not result from the misidentification or failure to properly identify the materials by [Scott Galvanizing] or the negligence of [Scott Galvanizing].

Majority opinion, at 810.

While the language referred to does somewhat narrow the broad, all-inclusive language of the indemnity agreement, it does not state that Scott Galvanizing would remain responsible only for liability caused by its own fault or negligence (majority opinion, at 810-11), nor does it impact the requirement, clearly expressed in *Jones*, *Brame*, and *Gall*, that there be evidence of an act or omission by the indemnitor causing or contributing to the loss.

The analytical error in the majority opinion, as I see it, is the conclusion that an intent to indemnify somehow takes the place of or satisfies the requirement of culpable conduct on the part of the indemnitor. That critical element of culpable conduct does not exist in this case.

That the requirement of culpable conduct cannot be replaced merely by finding an intent to indemnify is demonstrated by a review of *Jones* and *Brame*.

In *Jones*, the language of the indemnity agreement was as broad as it can get. It reads:

> To indemnify and save harmless the CONTRACTOR from and against any and all suits, claims, actions, losses, costs, penalties, and damages, of whatsoever kind or nature, including attorney's fees, arising out of, in connection with, or incident to the SUBCONTRACTOR's performance of this SUB-CONTRACT.

*Jones*, at 521. In its analysis of the indemnity agreement before it, the *Jones* court makes this statement at pages 521-22:

> It is, therefore, Belden's performance of the subcontract, and losses "arising" from, connected with, or incidental to that performance, which forms the keystone on which indemnity turns. Thus, it is clear that unless an overt act or omission on the part of Belden in its performance of the subcontract in some way caused or concurred in causing the loss involved, indemnification would not arise. Belden's mere presence on the jobsite inculpably performing its specified contractual obli-

gations, standing alone, would not constitute a cause or participating cause.

(Footnote omitted.)

In *Brame*, the indemnity clause at issue read as follows:

> To indemnify and save harmless the CONTRACTOR [Baugh] from and against any and all suits, claims, actions, losses, costs, penalties, and damages, of whatsoever kind or nature, including attorney's fees, arising out of, in connection with, or incident to the SUBCONTRACTOR'S [General Mechanical's] performance of this SUBCONTRACT.

*Brame*, at 750-51.

In *Jones*, the sole cause of the accident was the indemnitee's performance or nonperformance of the contract. There was no act or omission on the part of Belden, the indemnitor, which contributed to the loss. In *Brame*, the court interpreted its ruling in *Jones*, stating at page 751 as follows:

> The court held that the indemnity clause would operate only if there were an overt act or omission on the part of Belden in its performance of the contract which in some way caused or concurred in causing the loss involved. *Jones v. Strom Constr. Co.*, 84 Wn.2d at 521-22. No such act or omission by Belden was established, and therefore the clause did not operate.

The Supreme Court referred to the holding in *Jones* again in the case of *Redford v. Seattle*, 94 Wn.2d 198, 205, 615 P.2d 1285 (1980), stating as follows:

> *Jones* merely limited the scope of such indemnification agreements to those cases in which some activity of the employer contributed to the injury.

It is clear that the *Brame* court treated the holding in *Jones* as a limitation on the scope of indemnification agreements. That limitation required an act or omission on the part of the indemnitor which causes or contributes to the loss.

In both *Jones* and *Brame*, the court was construing indemnity agreements which were written in such broad, sweeping language that one could say they contained no limitations whatsoever. Undoubtedly having in mind the injustices that such broad, sweeping language could bring

about, the Supreme Court limited the scope of such indemnification agreements by the requirement of culpable conduct.

This interpretation of *Jones* and *Brame* was followed in *Gall*, where this court stated at page 427:

> In resisting the subcontractor's motion for summary judgment, the general contractor (indemnitee) failed to produce evidence that the loss was "caused by or contributed to by the negligence of the indemnitor". *Brame*, at 750. A similar issue was before the court in *Jones v. Strom Constr. Co.*, 84 Wn.2d 518, 527 P.2d 1115 (1974). In *Brame*, the court described the effect of *Jones* as limiting the scope of such indemnification agreements to those cases in which some activity of the employer contributed to the injury.

The Supreme Court denied review of the *Gall* case on March 15, 1985.

The intent of the parties to enter into a very broad indemnity agreement was clearly present in both the *Jones* and *Brame* cases. The court in both cases required indemnitor culpability in spite of there being sufficiently broad language in the indemnity agreement itself for enforcing it without restriction. Broad indemnity language alone cannot be a substitute for the requirement of culpable conduct on the part of the indemnitor, as stated in *Jones* and *Brame*. To achieve the result sought by Scott Galvanizing, the indemnity agreement would have to show an intent to cover losses not contributed to by the indemnitor. The agreement in this case is not subject to that interpretation.

The enforcement of the indemnity agreement against NWES would impose upon NWES the same burden that the *Jones* and *Brame* cases intended to prevent — that is, the burden of being required to indemnify for losses which the indemnitor has not caused or contributed to in any way. The liability of Scott Galvanizing under CERCLA has not been contributed to by NWES. 42 U.S.C. § 9607(a)(2) and (3) appear to impose liability on Scott Galvanizing as a generator of a hazardous substance without any fault on the part of NWES.

The majority opinion goes directly against the limitation imposed on indemnity agreements by the *Jones* and *Brame* cases and would impose a liability on NWES which has the potential of exceeding the value of the entire transportation contract. The limitation placed upon such broad indemnity agreements is a wise one, has a salutary purpose, and it should be enforced.

For these reasons, I dissent.

Review granted at 119 Wn.2d 1002 (1992).