IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JEANETTE K. PHILLIPS, | ) | No. 78762-4-I (Consolidated with |
| | ) | No. 78860-4-I) |
| Appellant/Cross-Respondent, | ) | |
| | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CHRISTOPHER R. SMITH and JOELLE R. SMITH, a married couple, | ) | |
| | ) | |
| Respondents/Cross-Appellants. | ) | |
| | ) | FILED: March 23, 2020 |

HAZELRIGG, J. — Jeanette K. Phillips seeks reversal of an order granting summary judgment to Christopher and Joelle Smith (the Smiths) and ordering Phillips to sell a house to the Smiths pursuant to the provisions of a lease agreement with option to purchase. Phillips contends that the Smiths did not meet their obligations under the contract and that the court erred in awarding the Smiths costs and fees. The Smiths cross-appeal, arguing that the court should have awarded them damages for rental payments made to Phillips during litigation. We affirm the order of summary judgment and remand for entry of an award of damages for rental payments made as a result of the breach and for entry of findings of fact and conclusions of law regarding the award of attorney fees and costs.

FACTS

In 1991, Jeanette Phillips purchased a house on Ashworth Avenue in Seattle, where she lived until 2007. From 2007 to 2015, she rented the house to approximately 13 different tenants. Phillips met Christopher Smith when Smith, a mason, was working at the home of Phillips' friend Susan Rubstello. Phillips hired Smith to repair the chimney at her Ashworth Avenue house. She knew that Smith was looking for a place to rent and asked him if he would be interested in renting the house. She wanted to replace the current tenants because they were behind on rental payments and not taking care of the yard. Smith and his wife, Joelle, agreed to rent the house and moved in on June 15, 2015. The parties did not sign a lease agreement before the Smiths moved in but agreed that the lease would last three to five years and the Smiths would pay rent of $2,500 per month. At Rubstello's suggestion, Phillips and Smith had also discussed including an option to purchase the house in the lease agreement before the Smiths moved in.

On June 30, 2015, Phillips sent the Smiths a list of "things we need to work out," including notes about potential tax consequences and seller financing. The parties determined that the house was worth $700,000 after looking at Zillow[1] and Redfin[2] and agreed on that as a purchase price. At the time, Phillips owed between $100,000 and $115,000 on her mortgage, and the parties were aware that the Smiths would not be able to assume the mortgage. The parties planned for the Smiths to pay off the existing debt before taking title to the house. Phillips' notes

---

[1] A website and cell phone application utilized as a real-estate database, search engine, business directory, and rental management.

[2] A website and cell phone application utilized as a real-estate broker.

indicated that, "after the existing loan was paid off, [she] would be the financier for the $600,000 that was left." She was willing remain the lender for the $600,000 for up to 10 years after the Smiths took title to the house. Phillips did not consult an attorney about these issues because she believed the parties were going to work together with the same lawyer.

In early October 2015, Phillips emailed Smith saying it was "very important for [her] peace of mind that [they] get the lease agreement completed even if [they] have to wait on the other stuff." That month, the parties met at the Ashworth Avenue house with Rubstello to discuss the terms of the agreement. Rubstello took notes on the proposed terms and the parties initialed each page of her handwritten notes. The notes indicated that the parties agreed to a selling price of $700,000 and Phillips would lend the Smiths the amount due at closing at a five percent interest rate.

After the meeting, Smith gave Phillips a draft "Lease Agreement with Option to Purchase Real Estate" that he had adapted from a form agreement he found online. Phillips reviewed the draft agreement in its entirety and hand-wrote two comments on the draft, which she discussed with Smith by telephone. The first comment concerned the term of the lease option, which she corrected from 15 years to three years. The second comment indicated that she wanted language removed that would give the Smiths a right of assignment. After this conversation, Phillips understood that Smith was going to make those changes to the draft. Phillips acknowledged that paragraph 24 stated that both parties had sought the advice of counsel, if desired, and that she had not done so.

Two days later, Smith emailed Phillips explaining that the 15-year term was based on her current mortgage loan with the bank and asking what would happen if they did not have the money to pay off the rest of the loan at the end of the lease term. Phillips responded by telephone that this was a risk of entering into a lease with option to purchase and that she could choose to extend the option lease at her discretion.

The following day, the Smiths brought Phillips a revised copy of the final agreement. The Smiths explained the changes that had been made from the prior draft, but Phillips did not read the final draft before signing. On October 22, 2015, the parties signed the agreement and had it notarized at Phillips' bank in Kenmore. When Phillips signed the contract, she knew that she had the right to discuss it with an attorney but had not done so. Smith recorded the agreement with the King County Auditor the same day.

The final option lease specified a term of three years, from June 15, 2015 to 11:59 p.m. on June 14, 2018. The Smiths were entitled to exercise their option to purchase the house for $700,000, less any credits toward the purchase price, "at any time during the term of this option lease" by providing notice to Phillips "at least sixty (60) days prior to the expiration of the initial term." The section regarding transfer of title included the following language: "[i]n the event the Buyers/Tenants chose [sic] to exercise their option to purchase, they will notify the Seller/Landlord during the term of this agreement. The Seller/Landlord further agrees to furnish the Buyers/Tenants with an owner's title binder within forty-five . . . (45) days after receiving notice." The agreement also provided that "[t]he deed shall be delivered

and the purchase money shall be paid . . . no later than sixty (60) days after notification to the Seller/Landlord of the Buyers'/Tenants' exercise of the purchase option." The agreement noted that "[t]ime is of essence in this option to purchase agreement."

The agreement included the monthly rent of $2,500 and provided that the Smiths would pay an additional $500 per month after Phillips supplied them with her completed personal estate planning documentation providing the Smiths with "security protection." This additional payment would be applied "toward [Phillips'] financial obligations currently owing against the real estate to be credited against the purchase price." The Smiths never began making this payment because Phillips did not send them her estate planning documents.

In November 2016, about halfway through the three-year option lease term, Phillips emailed Smith regarding shopping for a home loan. In response, Smith sent an email saying:

> Jean. We are opening a cafe and will not be in any position to purchase the home for about a year. But as soon as we can we will beg[i]n the process which will be well before the time allotted on our agreement. I am sure. Sorry we cannot act any sooner.

Phillips responded, "That is not what you said last Tuesday." Smith explained,

> I did not fully under[stand] what you were saying last Tuesday. I assumed you meant to make sure it all happens within the allotted time. If you would like to modify the contract we can discuss. But I am very busy at the moment and won't have much time to deal with this till after the holidays. Sorry [J]ean.

Later that day, Phillips sent the following email:

> Chris, you broke the lease by taking up the kitchen floor without consulting me. I do not understand why you would do something like that unless you were not serious about the contract of the house.

Further, you said on the 9th that you would get started on buying the house. I am not interested in waiting for the economy to tank again. It is going to happen, as it has every republican administration in my lifetime. You had the plan to buy the house before you started the café.

My brother died on October 9th and I want to get on with my life which I cannot do unless I have the money from my house.

Life has gotten awfully short all of a sudden and I want to get on with it.

Start shopping for a mortgage and get qualified. Lock in a rate so you can afford to do both the café and the house. I was not kidding on the 9th and I am not kidding now. I do not know how you could have misunderstood me.

Almost a year later, on October 28, 2017, Smith emailed Phillips and advised her that they were taking steps to prepare to purchase the house, saying, "I believe our loan should be near complete by the beginning of the year!! Before May we will have a check for $750,000.00 dollars [sic] payable to Jean Phillips." Phillips called Smith after receiving this email to discuss rent payments, but did not otherwise respond because she "didn't take him seriously." Phillips did not obtain a title binder within 45 days of this email.

A few weeks later, on November 15, 2017, Smith sent another email about steps to purchase the house:

I talked to my real estate lawyer and everything looks solid in the contract. It looks like you will need payment before being able to get the title to the home as there is [I'm] guessing around 100k left on the loans.
The loan is already processed and so if you would like we can close the deal well before [M]ay.
Let me know.

Phillips responded that she would have her attorney contact the Smiths' attorney and asked for their contact information. Phillips interpreted this email as a

- 6 -

continuation of the October email and did not obtain a title binder in the following 45 days.

On December 21, 2017, the Smiths sent Phillips an email stating, "Hi Jean, this is a letter to let you know our intent to purchase 8001 [A]shworth Ave N, with a minimum of 60 [d]ays notice." Phillips recognized this as the Smiths exercising their purchase option under the option lease. She did not respond to this email or return subsequent phone calls from the Smiths. She did not obtain a title binder within the next 45 days.

Smith emailed Phillips again on January 11, 2018 and attached a residential purchase and sale agreement that specified a closing date near the end of the lease term:

Hi Jean.

Attached is a copy of the loan/purchase agreement for you to review.

The close date would be 6/13/17.

All your current debts on the house would be paid in full following escrow.

There will be no additional costs or taxes to you, I have taken care of everything. I currently am holding a copy that we can meet and sign or you can simply print, sign and send me the attached copy and I will get it to my agent Tyler Woodbridge of John L Scott in Renton.

This form does not need to be notarized, only the forms completing the transaction after you are handed a check on 6/13/17.

Till then we obviously will continue to pay our lease.

If there is any other information you want, please let me know. Have your lawyer look over the paperwork if you would like, I am using the [simplest] loan so everything is very [straightforward].

> Hope you are doing good!
> The Smiths

The purchase and sale agreement contained a financing addendum that gave the Smiths 90 days to apply for a "Conventional First" mortgage loan after Phillips' acceptance of the agreement. Phillips did not respond to this email.

Smith emailed her again on January 16, 2018, saying, "Hoping to hear back from you soon. That contract expires on Friday and it's easy enough to have them make another but I would rather avoid that if possible. If you have other concerns, I would like to hear them so we can work through them." Phillips did not respond to this email, but did mark up the proposed purchase and sale agreement. Phillips did not obtain an owner's title binder after receiving these emails.

On February 7, 2018, Phillips emailed Smith the following letter:

> Dear Chris:
> You asked me to think about it and after doing the numbers, and speaking with my accountant this is what I came up with.
>
> When we discussed the agreement three years ago you said if it was not a win for both of us it would not happen.
> Then you tore up the floor and made changes to the house without giving me receipts to take expenses off my taxes.
> You say that the hot water tank exploded, if that is so, my insurance would have covered the repairs except for a deductible. Still you didn't give me a receipt or even tell me that it happened until November.
> When my brother died, I was required to get values on everything that he owned. That included the land in Kenmore which I would have paid for with the proceeds from selling 8001.
> The land is in a trust the trust had to be revalued to current value on land is 2.5 million.
> Right now, to just pay for the land, I must get over $1 million dollars for 8001 which is worth $1.1 million now.
> I need my Kenmore house repaired but there will not be any money for that once I pay for the land.
> After capital gains, paying off mortgage and excise taxes I will net about $435K[.]

You told me you had invested in a café so it seemed like you didn't have funds to buy my house.
As I said before, my 8001 house is now worth 1.1 million and someone is willing to pay me for it.

So, if you can get the money to make this a win win for both of us.
I would be happy to sell the house to you for 1.1 million. Or, you can take me for the $400,000.00 and I would lose, and you would win.

Jean

Phillips later recalled the email containing this letter from Smith's inbox. She did not have a specific buyer interested in purchasing the house.

The Smiths engaged counsel, who wrote to Phillips on February 12, 2018 to again give notice of the Smiths' intent to exercise the purchase option. She attached a purchase and sale agreement to that email that included a closing date of June 13, 2018, was contingent upon the Smiths obtaining financing, gave the Smiths three months to apply for a "Conventional First" mortgage loan, and allowed the Smiths to assign their interest in the agreement. The letter indicated that "[w]e expect you to promptly execute and return the purchase agreement."

That day, Phillips sent Rubstello a text message saying "I just lost 300[]thousand dollars because of your interference in my business when I was venerable [sic]." When Rubstello asked what she was talking about, Phillips responded, "My house is worth 1[]million. I have a buyer who will pay 1[]mill. [C]hris didn't follow the lease but he just sent a purchase option to buy and so he gets the 300 k equity and I lose 300k. You fail as a financial advisor."

Phillips' attorney then contacted the Smiths' attorney. On February 16, 2018, Phillips' counsel stated, "[i]t appears from the communications from Mr. Smith that he exercised the option on November 15, 2017 and was not able to

close within the 60 day period required under the Agreement, therefore breaching the Agreement and waiving Buyers' option right." (Emphasis omitted). The email pointed out the section of the agreement providing that the purchase money shall be paid no later than 60 days after the date of the notice. The Smiths' attorney replied that the Smiths would be "ready to close within 60 days (on April 13th), as required by the option agreement." On March 1, 2018, Phillips sent the Smiths a notice to terminate tenancy that required them to vacate the house within 11 days.

On March 12, 2018, the Smiths filed suit for breach of contract, seeking injunctive relief ordering enforcement of the purchase option and preventing Phillips from evicting them, as well as damages and attorney fees and costs. The parties filed cross motions for summary judgment. The court granted the Smiths' motion, denied Phillips' motion, and ordered Phillips to sell the house to the Smiths pursuant to the provisions of the agreement. The court also awarded the Smiths reasonable costs and attorney fees in the amount of $77,052.41. The court did not enter findings of fact and conclusions of law.

## ANALYSIS

### I. Summary Judgment

Phillips contends that the trial court erred in granting the Smiths' motion for summary judgment and in denying her own motion for summary judgment. She argues that the Smiths forfeited their rights under the agreement by improperly exercising the option and failing to tender the purchase price, which relieved her of her obligation to perform. The Smiths argue that their notices were effective

and they were able to purchase the house within the allotted time, but Phillips' anticipatory breach of the agreement excused their nonperformance.

### A. Standard of Review

We review summary judgment orders de novo, engaging in the same inquiry as the trial court. Green v. A.M.P. (Am. Pharm. Co.), 136 Wn.2d 87, 94, 960 P.2d 912 (1998). We consider the evidence and all reasonable inferences from the evidence in the light most favorable to the nonmoving party. Keck v. Collins, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. CR 56(c); Keck, 184 Wn.2d at 370. The moving party bears the burden to show that there is no genuine dispute as to any material fact. Green, 136 Wn.2d at 100. "Only when reasonable minds could reach but one conclusion on the evidence should the court grant summary judgment." Versuslaw, Inc. v. Stoel Rives, LLP, 127 Wn. App. 309, 319, 111 P.3d 866 (2005). The appellate court may affirm the trial court's judgment on any theory established by the pleadings and supported by the evidence. Wendle v. Farrow, 102 Wn.2d 380, 382, 686 P.2d 480 (1984).

### B. Exercise of Option

Phillips first argues that the Smiths failed to properly exercise their option to purchase the house. The Washington Supreme Court has explained the general principles of option agreements as follows:

> An optionee may exercise an option by complying with the terms of acceptance set forth in the option agreement. If the optionee

unconditionally exercises the option in accordance with the terms of the contract, the optionor must sell the property in accordance with the terms of the option. If the optionee fails to exercise the option within the time specified or in the manner provided, all rights under the contract, along with any consideration given, are forfeited. If the optionee exercises the option under the terms of the contract and the optionor refuses to sell the property, the optionee may be entitled to specific performance of the contract. The terms of an option contract are to be strictly construed and, generally, time is of the essence.

Pardee v. Jolly, 163 Wn.2d 558, 568, 182 P.3d 967 (2008) (citations omitted).

The option contract allowed the Smiths to exercise their option to purchase if they gave notice to Phillips in writing, via letter or email, that they were exercising the option at least 60 days before the end of the agreement. A separate section of the agreement concerning transfer of title required the seller to "furnish the Buyers/Tenants with an owner's title binder within forty five . . . (45) days after receiving notice." This requirement imposes an obligation on the seller only. The section of the agreement concerning closing states that "[t]he deed shall be delivered and the purchase money shall be paid at the lending institution's, or other office, of Buyers'/Sellers' choice, no later than sixty (60) days after notification to the Seller/Landlord of the Buyers'/Tenants' exercise of the purchase option." This section imposes obligations on both the buyers and the seller. The agreement provides that "[t]ime is of essence in this option to purchase agreement."

Timely, written notice was all that was required for the Smiths to properly exercise their option. The agreement did not require any specific words of acceptance or inclusion of a closing date in the notice. The requirement that the parties close the sale within 60 days after notification was included in a separate section of the contract and was not a term of acceptance of the option.

- 12 -

Although the October and November emails reference the potential sale, the December 21, 2017 email was the first explicit, unambiguous notice that the Smiths were exercising their option to purchase the house. This notice was delivered in writing, by email, more than 60 days before the end of the lease agreement. The December email complied with the terms of acceptance specified in the agreement, triggering Phillips' obligation to sell the property to the Smiths in accordance with the terms of the contract. The February email from the Smiths' counsel also met the requirements for exercise of the option.

Phillips argues that the Smiths' exercise of the option was improper because their proposed purchase and sale agreements sent in January and February imposed conditions on the sale that were not included in the original agreement. She contends that these conditions amounted to a rejection of the original offer contained in the agreement and extension of a counter-offer. This argument does not take into account that the acceptance had already occurred and the contract had already been formed as of the December email.

Additionally, Phillips does not point to any indication by the Smiths that they would refuse to complete the sale if she did not agree to the purchase and sale agreement as written. Indeed, the record indicates the opposite. When Phillips objected to the closing date listed in the proposed purchase and sale agreement, the Smiths withdrew the proffered document and stated they would be ready to close within 60 days as required by the option agreement. The statements from the Smiths' counsel that they expected Phillips "to promptly execute and return the purchase agreement" do not indicate that they would not entertain any changes to

the agreement, especially in light of the fact that Phillips had not been responsive to the Smiths' prior attempts to finalize the sale.

The Smiths gave timely, written notice to Phillips that they were exercising their option to purchase the house in December 2017. The parties were then obligated to complete the transaction in accordance with the terms of the contract.[3]

### C. Breach of Contract

Phillips next contends that the Smiths are not entitled to relief because they did not tender the purchase price as required by the contract. The Smiths respond that they were relieved of their duty to perform because Phillips committed an anticipatory breach of the contract before the time for performance.

Generally, when a contract requires performance by both parties, the party claiming that the other breached the contract by nonperformance "must establish as a matter of fact the party's own performance." Wallace Real Estate Inv., Inc. v. Groves, 124 Wn.2d 881, 897, 881 P.2d 1010 (1994). In a contract for the sale of real estate, "the payment of the purchase price and the delivering of the deed are concurrent acts." Id. However, one party is not required to perform if the other has committed an anticipatory breach of the contract. CKP, Inc. v. GRS Const. Co., 63 Wn. App. 601, 620, 821 P.2d 63 (1991).

An anticipatory breach occurs when one of the parties to a bilateral contract repudiates the contract prior to the time of performance. Wallace Real Estate, 124 Wn.2d at 898. "An intent to repudiate may be expressly asserted or

---

[3] Phillips argues briefly that the provision of the agreement stating that she would provide financing for the sale is unenforceable. However, because the Smiths did not seek enforcement of the seller financing provision, we decline to consider this argument.

- 14 -

circumstantially manifested by conduct." CKP, 63 Wn. App. at 620. A party's intent not to perform may not be implied from doubtful and indefinite statements that performance may or may not take place or from a negative attitude alone. Lovric v. Dunatov, 18 Wn. App. 274, 282, 567 P.2d 678 (1977). "The law requires a positive statement or action by the promisor indicating distinctly and unequivocally that he either will not or cannot substantially perform any of his contractual obligations." Id. "The question of anticipatory repudiation is one of fact, and can be decided on summary judgment only 'if, taking all evidence in the light most favorable to the non-moving party, reasonable minds can reach only one conclusion.'" Versuslaw, 127 Wn. App. at 321 (quoting Alaska Pac. Trading Co. v. Eagon Forest Prods., Inc., 85 Wn. App. 354, 365, 933 P.2d 417 (1997)).

"There is an implied covenant of good faith and fair dealing in every contract, a covenant or implied obligation by each party to cooperate with the other so that he may obtain the full benefit of performance." Miller v. Othello Packers, Inc., 67 Wn.2d 842, 844, 410 P.2d 33 (1966). When a party reneges on a deal without affording the other party an opportunity to address an action believed to be a material breach of the contract, they violate their duty to operate in good faith. See McEachren v. Sherwood & Roberts, Inc., 36 Wn. App. 576, 580, 675 P.2d 1266 (1984). "[W]hen an agreement makes time of the essence, fixes a termination date, and there is no conduct giving rise to estoppel or waiver, the agreement becomes legally defunct upon the stated termination date if performance is not tendered." Local 112, I.B.E.W. Bldg. Ass'n v. Tomlinson Dari-Mart, Inc., 30 Wn. App. 139, 142, 632 P.2d 911 (1981). There is an exception to

this rule "when the failure to meet the time limit is the result of one of the parties' bad faith or lack of due diligence." Id.

Phillips contends that the Smiths gave five effective notices of their intent to exercise the option, beginning with the October 28, 2017 email, and the 60-day period to tender the purchase price had expired before any communication between the attorneys took place. As noted above, the December 2017 email constituted the first explicit, unequivocal notice that the Smiths were exercising the option. Phillips admitted that she did not interpret the October and November emails as exercise of the option. Even if those earlier communications were sufficient to constitute acceptance, Phillips would not be entitled to claim that the 60-day period for closing expired when she made no response to the Smiths' notice and allowed the period to pass without cooperating to effectuate the completion of the sale.

The Smiths contend that Phillips' "complete refusal to cooperate with the Smiths since their notice and her attempt to bully them into changing the terms of the Option Agreement," along with her attorney's assertion that they had waived their option right in his February 16, 2018 email, "indicated distinctly and unequivocally that she would not be closing the sale on February 19, 2018."

Viewing the evidence in the light most favorable to Phillips, her lack of response to the Smiths' exercise of the option and her February 7, 2018 letter were not sufficiently definite to indicate her intent to repudiate the contract. Her attorney's email stating his belief that the Smiths had breached the contract and waived their option right and proposing changes to the purchase and sale

- 16 -

agreement, however, manifested a clear intent that performance of the contract would not take place on February 19, 2018. The subsequent notice terminating the Smiths' tenancy and requiring them to vacate the premises manifested a clear intent to repudiate the contract in its entirety. Even viewed in the light most favorable to the non-moving party, the evidence indicates that Phillips repudiated the contract and the Smiths were excused from performance.

II.    Award of Costs and Attorney Fees

Phillips contends that the trial court erred in awarding the Smiths $77,052.41 for "reasonable costs and attorney fees incurred in this litigation" because this amount included fees and costs related to wasteful and duplicative efforts. She also contends that the trial court erred in failing to enter findings of fact and conclusions of law concerning the award. The Smiths argue that Phillips has not demonstrated that the award was manifestly unreasonable, but they do not respond to the argument regarding entry of findings.

In Washington, trial courts may award attorney fees when authorized by a private agreement, a statute, or a recognized ground of equity. Fisher Prop's, Inc. v. Arden-Mayfair, Inc., 106 Wn.2d 826, 849–50, 726 P.2d 8 (1986). Whether a statute or contract provision authorizes an award of attorney fees is a question of law that we review de novo. Deep Water Brewing, LLC v. Fairway Res. Ltd., 152 Wn. App. 229, 277, 215 P.3d 990 (2009). We review the reasonableness of an award for abuse of discretion. Rettkowski v. Dep't of Ecology, 128 Wn.2d 508, 519, 910 P.2d 462 (1996). "The trial court abuses its discretion only when the exercise of its discretion is manifestly unreasonable." Id.

Generally, Washington follows the lodestar method of calculating reasonable attorney fees. Mahler v. Szucs, 135 Wn.2d 398, 433, 957 P.2d 632 (1998), overruled on other grounds by Matsyuk v. State Farm Fire & Cas. Co., 173 Wn.2d 643, 272 P.3d 802 (2012). Under this system, the trial court determines the number of hours reasonably expended in the litigation from documentation of the work performed and the category of attorney who performed the work. Bowers v. Transamerica Title Ins. Co., 100 Wn.2d 581, 597, 675 P.2d 193 (1983). "The court must limit the lodestar to hours reasonably expended, and should therefore discount hours spent on unsuccessful claims, duplicated effort, or otherwise unproductive time." Id. The total number of hours reasonably expended multiplied by the reasonable hourly rate of compensation for each attorney involved yields the basic lodestar fee, which the court may then adjust to reflect a number of other factors. Id.

Due to the discretionary nature of this calculation, when a trial court awards attorney fees, "it must supply findings of fact and conclusions of law sufficient to permit a reviewing court to determine why the trial court awarded the amount in question." SentinelC3, Inc. v. Hunt, 181 Wn.2d 127, 144, 331 P.3d 40 (2014). Although "[f]ee decisions are entrusted to the discretion of the trial court," appellate courts "exercise [their] supervisory role to ensure that discretion is exercised on articulable grounds." Mahler, 135 Wn.2d at 435. The Washington Supreme Court held that a trial court "erred by failing to explain the amount of its award" when it did not enter any findings of fact or conclusions of law justifying the attorney fee

award, but only entered a two-page judgment summary listing the awards for fees and costs. SentinelC3, 181 Wn.2d at 145.

Here, paragraph 26 of the option lease provides that, "[i]n the event this agreement is placed in the hands of an attorney for enforcement[,] the prevailing party shall be entitled to recover court costs and attorney fees." The Smiths submitted documentation of the legal work performed in litigating the case and requested attorney fees and costs of $84,344.41. Phillips objected to this amount, arguing that the Smiths had not proven the reasonableness of the requested fees, that the request included duplicative or unnecessary items, and that the explanation of time spent was insufficiently specific. She requested that any fees imposed be reduced by at least $17,208.50, for a maximum fee award of $67,135.91. The order granting summary judgment for the Smiths and denying summary judgment for Phillips states that "it is hereby . . . ORDERED, ADJUDGED AND DECREED that Smith is entitled to an award of his reasonable costs and attorney fees incurred in this litigation in the amount of $77,052.41." A judgment summary was also entered listing the same amount due with no further explanation. The court did not enter separate findings of fact or conclusions of law regarding the award of attorney fees and costs.

Although the court was correct in concluding that the option lease entitles the Smiths to an award of court costs and attorney fees as the prevailing party, the court erred in failing to enter findings of fact and conclusions of law explaining the award. Absent these findings, we are unable to assess whether the court exercised its discretion appropriately, especially because the award differed from

the requests of the parties. In this instance, remand for entry of findings of fact and conclusions of law regarding the award of attorney fees and costs is appropriate.

III. Damages

In their cross-appeal, the Smiths contend that the trial court erred in declining to award them reimbursement of rent paid to Phillips during the litigation. The Smiths argue that they are entitled to reimbursement of the rent payments made since April 2018, because they would not have been required to make these payments to Phillips if the sale of the house had taken place on April 13, 2018. Phillips argues in response that the Smiths have not proven their damages with reasonable certainty because they have not shown what their expenses would have been after the sale of the house and they are not entitled to be placed in a better position than they would have been if the contract had not been broken.

Generally, the injured party in a breach of contract action is entitled to recover all damages that accrue naturally from the breach and to be put into as good a pecuniary position as if the contract had been performed. Eastlake Const. Co. v. Hess, 102 Wn.2d 30, 39, 686 P.2d 465 (1984). "He is entitled to the benefit of his bargain, i.e., whatever net gain he would have made under the contract[,]" but is not "entitled to more than he would have received had the contract been performed." Platts v. Arney, 50 Wn.2d 42, 46, 309 P.2d 372 (1957) (emphasis omitted). If the breach relieves the injured party of duties under the contract which would have required them to spend money, the amount of those expenditures should be deducted from amount recovered. Id.

Here, if the contract had been performed and the parties had completed the sale of the house, the Smiths would not have had to pay rent to Phillips after the close of the sale. Although the contract provided for the Smiths' repairs, maintenances, and improvements to be credited toward the purchase price, as well as any payments above the monthly rent, it did not provide for the rent payments themselves to be credited toward the sale price. The rent payments after the April 13, 2018 closing date specified in the final notice of the exercise of the option accrued naturally from Phillips' anticipatory breach of the contract. The Smiths are entitled to recover these damages, less any expenditures that would have been required but for the breach.

IV.     Attorney Fees on Appeal

Both parties contend that they are entitled to attorney fees on appeal pursuant to RAP 18.1 and paragraph 26 of the option lease. "Reasonable attorney fees are recoverable on appeal if allowed by statute, rule, or contract" and properly requested under RAP 18.1. In re Guardianship of Wells, 150 Wn. App. 491, 503, 208 P.3d 1126 (2009). The option lease entitles the prevailing party to an award of attorney fees and costs. Both parties include a section requesting fees in their opening briefs to this court. As the prevailing party, the Smiths are entitled to an award of attorney fees and costs on appeal in an amount to be determined by a commissioner of this court in accordance with RAP 18.1.

Remanded for an award of damages for rent paid as a result of the breach and for entry of findings of fact and conclusions of law regarding the award of attorney fees and costs.

Affirmed in part, remanded in part.

WE CONCUR: